Elizabeth POWELL et al., Plaintiffs,

v.

Benjamin WARD et al., Defendants.

No. 74 Civ. 4628 (CES).

United States District Court,
S. D. New York.

Feb. 27, 1980.

Elizabeth L. Koob, Bronx Legal Services, New York City, for plaintiffs.

Robert Abrams, Atty. Gen. of the State of New York, New York City, for defendant Phyllis Curry; Judith A. Gordon, New York City, of counsel.

## MEMORANDUM DECISION

STEWART, District Judge:

Plaintiffs, inmates at the Bedford Hills Correctional Facility ("Bedford Hills") have moved for an order holding defendant Phyllis Curry, superintendent of Bedford Hills, in contempt for failing to comply with our Order issued on June 23, 1975.

Plaintiffs brought this action to enjoin the officials at Bedford Hills from enforcing prison disciplinary procedures unless and until they comply with the guidelines set forth by the Supreme Court in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41

L.Ed.2d 935 (1974).[1] We granted class certification on March 27, 1975, defining the class to include "all persons who are now and who may be incarcerated in Bedford Hills Correctional Facility" and "who are or may be subject to Adjustment Committee Proceedings or Superintendent's Proceedings at the institution."

Hearings were conducted, and we held that "any disciplinary proceedings which may result in placement in solitary confinement", which included Adjustment Committee Proceedings and Superintendent's Proceedings, must conform to the procedural requirements established by the Supreme Court in *Wolff v. McDonnell, supra.* We then found that defendants failed to provide inmates facing Adjustment Committee Proceedings with adequate notice, opportunity to call witnesses, explanation of the disposition, and statement of the evidence relied upon in reaching the disposition. There was also evidence showing that inmates were placed in segregation for as long as four weeks pending investigation of charges against them and that the official involved in an incident leading to a disciplinary proceeding or a subsequent investigation of that incident presided in some instances over the disciplinary proceedings.

Although some of the safeguards set forth in *Wolff v. McDonnell, supra,* were generally followed in the Superintendent's Proceedings, some of the procedures were never followed, such as providing inmates with the right to call witnesses, and others were provided sporadically. *See Powell v. Ward*, 392 F.Supp. 628 (S.D.N.Y.1975). We concluded that injunctive relief was warranted, and entered a preliminary injunction on June 23, 1975, which was modified on appeal. *Powell v. Ward*, 542 F.2d 101 (2d Cir. 1976).[2]

In December of 1976 three members of the plaintiff class moved to hold the superintendent of Bedford Hills in contempt for failing to comply with the Court's Order. We ordered that the correctional and parole files of the three inmates be expunged of all reference to the incident giving rise to the contempt motion, awarded plaintiffs attorneys' fees, and noted that "this Court is concerned by indications that our prior order has not been fully complied with and we will consider future violations of the order as matters of utmost seriousness." *Powell v. Ward*, 74 Civ. 4628, June 24, 1977 (order).

In March of 1979 Carol Crooks, a member of the plaintiff class brought this motion to hold defendant Phyllis Curry in contempt and for other related relief. After a one day hearing, Crooks adjourned her motion and a contempt motion on behalf of the class was filed. Hearings were held in June of 1979, and the parties subsequently submitted proposed findings of fact and conclusions of law.

*Class Certification*

Before determining whether the defendant has failed to comply with our order and if so whether her non-compliance constitutes contempt, we must address defendant's contention that the class action order is jurisdictionally defective insofar as it includes future inmates and future Adjustment Committee and/or Superintendent's Proceedings. Defendant's failure to challenge class certification in a timely manner constitutes sufficient grounds for rejecting

---

1. In *Wolff v. McDonnell*, decided June 26, 1974, the Supreme Court held that prisoners subject to disciplinary proceedings must be accorded the following rights: advance written notice of charges to be given at least 24 hours before a hearing, a written statement by the factfinders of the evidence relied on and the reasons for the disciplinary action, the right to call witnesses and present documentary evidence when doing so does not jeopardize institutional safety or correctional goals, and the right to counsel where the inmate is illiterate or where the issues are unusually complex. 418 U.S. at 563–67, 569–70, 94 S.Ct. 2963, at 2978–80, 2981, 41 L.Ed.2d 935.

2. Defendants appealed only from the provisions of the order concerning the membership of the Adjustment Committee and Superintendent's Proceedings and the time an inmate may be held in segregation pending investigation. They did not challenge the order granting class certification or the applicability of the *Wolff* procedural requirements to the Adjustment Committee. *See Powell v. Ward*, 542 F.2d 101 (2d Cir. 1976).

defendants' claim, especially in light of the unfairness to the class which would result from decertifying the class· at this time. We originally granted class certification on March 27, 1975. Defendants did not oppose certification at that time or during the trial and did not raise any such objection on appeal. Nor did defendants challenge the validity of the class at the first contempt hearing in 1977. We are reluctant to consider at this late date the threshold question of the validity of the class.

However, in light of the importance of the Article III requirements of existence of case or controversy, we have considered defendants' claim and find it to be without merit. Courts have approved certification of classes which include future members, *Robertson v. National Basketball Association*, 389 F.Supp. 867, 897 (S.D.N.Y.1975), especially in civil rights cases, where the members of the class are usually "incapable of specific enumeration." Advisory Note to Rule 23. *See, e. g., Marcera v. Chinlund*, 595 F.2d 1231, 1940 (2d Cir. 1977); *Forts v. Malcolm*, 426 F.Supp. 464, 465 (S.D.N.Y. 1977); *Baird v. Lynch*, 390 F.Supp. 740 (W.D.Wis.1974); *Wallace v. McDonald*, 369 F.Supp. 180, 188 (S.D.N.Y.1973); *Inmates of Lycoming County Parish v. Strode*, 79 F.R.D. 228 (M.D.Pa.1978); *Tunin v. Ward*, 78 F.R.D. 59 (S.D.N.Y.1978). Any class consisting of the inmates confined at an institution is likely to include individuals who were not identifiable at the time the class was certified. In the prison context, where any action taken will affect future inmates and "the constant existence of a class of persons suffering the deprivation is certain", class certification including future members is appropriate. *Gerstein v. Pugh*, 420 U.S. 103, 110–11, n.11, 95 S.Ct. 854, 861 n.11, 43 L.Ed.2d 54 (1974); *Inmates of Lycoming County Prison v. Strode*, 79 F.R.D. at 231.[3]

*Mathews v. Diaz*, 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976), the case upon which the defendants base their argument, is not inconsistent with our decision upholding class certification. There, the Court was concerned with the appropriateness of class certification in a case brought under the Social Security Act, which requires final agency action by the Secretary of HEW denying enrollment in a particular Medicare program before a federal court can exercise jurisdiction. *See* 42 U.S.C. § 405(g). The Supreme Court relied on the absence of such final agency action as a basis for holding that a class defined to include those who "will be denied enrollment" was too broad. 426 U.S. at 71, n.3, 96 S.Ct. at 1887, n.3. Those concerns are inapposite in the instant case, which is brought under 42 U.S.C. § 1983. Therefore, we decline to modify or vacate our class certification order.

*Res Judicata as to Inmates Santana and Harris*

Defendants argue that inmates Santana and Harris may not be heard on this motion because their "claims" were previously litigated in Article 78 proceedings. Prior to the institution of this contempt motion by the class, Janie Harris brought an Article 78 proceeding under N.Y.C.P.L.R. § 7801 challenging the validity of the determination of a Superintendent's Proceeding dated June 15, 1979 based on defendants' failure to permit her to call witnesses, to inform petitioner of the factual circumstances supporting the charge, to accurately inform her of the testimony of inmate witnesses, and to provide her with an impartial hearing officer, in violation of our order in *Powell v. Ward*. Her petition was denied. Inmate Luz Santana filed an Article 78 petition for relief from an adverse determination of a Superintendent's Proceeding entered March 13, 1978. Her petition was granted based,

---

3. In cases where courts have denied class status to future members, they have been concerned primarily with the dangers of an amorphous, ill-defined class, such as unmanageability, difficulty of notifying class members and increased possibility of inadequate representation as to some class members. *See, e. g.,*

*Edwards v. Schlesinger*, 377 F.Supp. 1091 (D.D. C.1974).

These issues are not present here, where plaintiffs' counsel adequately represents the class and where the boundaries and location of the class are clear.

*inter alia,* on defendants' failure to interview an employee and to inform the inmate of the factual circumstances supporting the charge, and the absence in the record of anything relating to the incident which allegedly occurred.

 The precise nature of defendants' res judicata defense is not clear. Neither Harris nor Santana have filed individual claims in the instant case, and both are proceeding as members of the class. The class was not a party to the prior litigation, and it is well established that an adverse judgment cannot be asserted against a party unless there has been reasonable notice of the claim against him and an opportunity to be heard in opposition to that claim, as required by the due process clauses of the Constitution. *Hansberry v. Lee,* 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940); *Williamson v. Bethlehem Steel Corp.,* 468 F.2d 1201 (2d Cir. 1972). Therefore, the class is not precluded from relitigating the issue of the adequacy of the procedural safeguards provided in Harris' Superintendent's Proceeding for purposes of determining whether defendants are in contempt of our order.

 We are particularly puzzled by the assertion of Santana's prior litigation as a defense to the instant motion, in light of the determination in the Article 78 proceeding that defendants failed to provide necessary procedural safeguards and Santana was therefore entitled to relief. If this judgment is to have any binding effect on the determination of defendant's compliance with our order, it would be to estop the defendant from challenging the findings of the prior proceeding that defendants failed to notify Santana of the specific charges against her, to interview employees, to inform her of the factual circumstances supporting the charge or to give her a written disposition stating the basis for

the decision. *Santana v. Superintendent, Bedford Hills Correctional Facility,* January 27, 1978 (Article 78 proceeding).[4] However, in the absence of any pleadings or motions by plaintiff invoking collateral estoppel as to Santana's proceedings, it is unnecessary to determine whether the defendant is bound by the determinations in that prior litigation.

 It remains to determine whether Santana and Harris are barred from class membership or from obtaining specific relief to the extent that their claims have already been litigated. We note that the issues before the state court only challenged the validity of two Superintendent's Proceedings and did not concern most of the facts at issue or the relief sought in this case. In any case, we find that the prior judgments do not affect Santana's or Harris' membership in the class or their entitlement to class relief. A class action brought under 23(b)(2) is specifically intended "to reach situations where a party has taken action or refused to take action with a class, and final relief of an injunctive nature . . . settling the legality of the behavior with respect to the class as a whole is appropriate." Committee Note of 1966 to Rule 23, 3B Moore's Federal Practice ¶ 23.01[10–2]. A prerequisite to granting class certification under 23(b)(2) in addition to the general requirements is that:

> The party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief with respect to the class as a whole.

F.R.Civ.P., Rule 23(b)(2). The class is to be treated as an entity, rather than as an aggregate of individuals. *See* O. Fiss. The Civil Rights Injunction (1978). There are no opt out provisions for 23(b)(2) class actions,[5] and in any case it would be difficult

---

**4.** Collateral estoppel precludes relitigation of issues that were actually, fully and necessarily litigated in the prior proceeding. Restatement of Judgments § 70, comment (b) (1942); *Divine v. Commissioner of Internal Revenue,* 500 F.2d 1041 (2d Cir. 1974). The applicability of collateral estoppel here would depend on whether the Second Circuit's abrogation of the doctrine

of mutuality were extended to this context. *See generally* 1B Moore's Federal Practice ¶ 0.412. It is unnecessary to reach that issue here.

**5.** Even in 23(b)(3) actions, for which there are opt out provisions for potential class members, the previous institution of an independent ac-

to exclude inmates from relief which is designed to affect the practices and procedures of the defendant.

The situation here is analogous to that in *Sledge v. J. P. Stevens Co., Inc.*, 585 F.2d 625 (4th Cir. 1978), where the court dismissed individual plaintiffs' claims of discrimination, but granted class relief for discrimination. There, the court held that "the judgment of dismissal did not strip [the individuals] of any class membership, and to the extent that they would personally benefit, directly or indirectly, from any of the other remedies ordered by the district court, they have not been denied such benefits." *Id.* at 637.

The prior litigation may affect Harris' and Santana's entitlement to individual relief, such as expungement of records or damages. Although there is some confusion concerning the standard for determining whether res judicata bars subsequent relief in civil rights cases, *see Winters v. Lavine*, 574 F.2d 46, 55 (2d Cir. 1978), in the most recent case dealing with this issue, the Court of Appeals held that "where a constitutional issue has been actually raised in the state court, the litigant has made his forum choice and may not relitigate that issue in federal court." *Ornstein v. Regan*, 574 F.2d 115, 117 (2d Cir. 1978). To determine whether a constitutional issue was actually litigated, the Court considered the extent to which the pleadings and the lower court opinion referred to constitutional issues and the scope of jurisdiction of the state forum. *Id.*

Santana's Article 78 proceeding concerned whether her Superintendent's Proceeding was conducted in accordance with 7 N.Y.C.R.R. Part 253. There was no mention of violations of constitutional due process or *Powell v. Ward*. Therefore, she did not actually litigate the constitutional is-

sues now before us, and she is not barred from individual relief such as damages should such relief be found to be warranted.

Harris did litigate the constitutional issues in her Article 78 proceeding. She based her claims for relief squarely on the order in *Powell v. Ward*. Unless it is determined that the limited scope of jurisdiction of Article 78 proceedings precludes the application of res judicata,[6] Harris is precluded from relitigating the issue of her entitlement to individual relief for violations pertaining to the Superintendent's Proceeding challenged at the Article 78 proceeding. The Article 78 court had jurisdiction to provide the individual relief Harris sought. Therefore, we cannot hold that her claim was not actually and fully litigated there, and Harris is barred from relitigating her entitlement to relief concerning the Superintendent's Proceeding challenged in the Article 78 proceeding.

*Defendant's Compliance with the Court Order*

The issue before us concerns the extent to which the defendant has complied with our order requiring conformance to the procedural requirements set forth in *Wolff v. McDonnell, supra,* and embodied in our order. Based on the testimony and documents submitted at the hearings and depositions conducted in June of 1979, the affidavits submitted by the parties and all other material on the record concerning this issue, we make the following findings:[7]

*Adjustment Committee*

■ The introductory section of paragraph 1 of the order states that:

Defendants shall conduct all Adjustment Committee or Superintendent's Proceedings, or other disciplinary proceedings that may result in an inmate at Bedford Hills Correctional Facility being confined in a Special Housing Unit or Segregation

---

tion does not automatically exclude membership in the class. *See Supermarkets General Corp. v. Grinnel Corp.*, 59 F.R.D. 512 (S.D.N.Y. 1973).

6. Article 78 proceedings can provide relief if it is determined that "a determination has been made in violation of a lawful procedure . . ."

or was "an abuse of discretion, including abuse of discretion as to the nature or mode of discipline imposed."

7. These findings shall be considered findings of facts and conclusions of law, in accordance with Rule 52(a), F.R.Civ.P.

Unit, in accordance with the following procedures. . . .

Defendant Curry contends that this paragraph does not require procedural safeguards to be instituted in Adjustment Committee Proceedings, and has indicated that the administration at Bedford Hills treated the order as applying solely to Superintendent's Proceedings, tr. at 356, 365, 644. Defendant's position, which reads "Adjustment Committee" out of the order, is based at best on a strained interpretation of the last phrase of the introductory paragraph. The argument is that, because that last phrase refers only to proceedings resulting in confinement to Special Housing Unit or segregation, that phrase qualifies the scope of the order requiring procedural safeguards at Adjustment Committee Proceedings. Specifically, defendant argues that the safeguards are not applicable to proceedings that might result in keeplock, which is twenty-four hours a day confinement in one's cell, often without privileges or exercise, tr. at 12, 49, 52, 122. Also, defendant argues, the Adjustment Committee is not authorized to sentence an inmate to the Special Housing Unit as a disposition in a case. True, defendant concedes, following an Adjustment Committee Proceeding an inmate may be detained in the Special Housing Unit for a period of time pending a Superintendent's Proceeding. But the defendant suggests that, because the officer on the floor, not the Adjustment Committee, initially placed the inmate in segregation and only the Superintendent's Proceeding can ultimately sentence the inmate to the Special Housing Unit, the Adjustment Committee's decision to continue an inmate's detention in Special Housing for as long as sixteen days does not fall within the terms of the order, tr. at 17–18. The defendant concludes that, because the Adjustment Committee Proceedings never result in such confinement as a disposition and the order does not apply to keeplock, the order does not apply to Adjustment Committee Proceedings.

This complicated and somewhat tortured presentation of the meaning of our order does not in any way alter our long-standing view that the order unequivocally applies to Adjustment Committee Proceedings. The language of the order is clear and unqualified. Moreover, the findings of fact and conclusions of law which were issued prior to the order specifically enjoined the use of Adjustment Committee Proceedings unless and until due process safeguards were instituted. *Powell v. Ward,* 392 F.Supp. 628, 631 (S.D.N.Y.1975). Defendants never requested a modification or clarification of the scope of the order, nor was this issue raised on appeal. We are inclined to view defendant's grammatical gymnastics as an attempt to circumvent the impact of the order.

Furthermore, defendant's arguments ignore the fundamental concern underlying our decision in this case, namely, that the substantial deprivation resulting from solitary confinement of an inmate be based on a fair impartial hearing. 392 F.Supp. at 629. The language relied on by the defendant to limit the scope of the order was intended to insure that *all* proceedings that may result in solitary confinement were within the scope of the order. The testimony of prison officials and inmates alike indicated that keeplock is the equivalent of solitary confinement, tr. at 316. Indeed, keeplock is sometimes even more restrictive than confinement in the Special Housing Unit, when shower, exercise and other basic privileges are removed. Tr. at 49. Thus, keeplock is clearly included in the language and spirit of the order.[8]

8. This result is not contrary to recent authority concerning the question of the applicability of *Wolff v. McDonnell, supra,* notwithstanding changes in the regulations concerning the punishments the Adjustment Committee is empowered to impose. In *McKinnon v. Patterson,* the Court of Appeals held that keeplock for a period of up to 2 weeks was a substantial deprivation and left open the issue of whether 1 week in keeplock would and of itself constitute a substantial deprivation under the 14th Amendment. 568 F.2d 930, 938 (2d Cir. 1977). Subsequently, the state modified its regulations so that the maximum period of keeplock that could be imposed was one week, 7 NYCRR § 304(1)(d). In our view, the possibility that

We are equally unpersuaded by the argument that the Adjustment Committee cannot sentence an inmate to the Special Housing Unit. Defendant Curry overlooks the important consideration that inmates have spent as long as sixteen days in solitary confinement awaiting a Superintendent's Hearing. A fair hearing after the fact does not detract from the deprivation the inmate has already suffered. Even though the Adjustment Committee does not sentence the inmate, it makes a decision, based on the information presented to it at the hearing, that continued confinement is warranted. Due process requires that, if such a substantial deprivation is to be imposed on an inmate, a hearing conforming to the procedural requirements established in *Wolff v. McDonnell, supra,* is necessary.[9]

Thus it is clear from both the language and spirit of our order that it applies to Adjustment Committee Proceedings. It must now be determined to what extent the proceedings currently employed at Bedford Hills comply with our order.

*Notice*

█ Paragraph 1(a) of the order provides that:

Formal written notice of charges must be served on the inmate at least 24 hours before the hearing.

For Adjustment Committee Proceedings, the defendant's current policy is to provide inmates with a Notice of Report. This form indicates the inmate's name and status, a code number of the offense with which the inmate is charged, the location, time and date of the incident, and the signature of the investigating officer. (Exhib-

it E.) The offense indicated by the code number is not included on the form. To find out the offense category referred to by the code number, the inmate must refer to the "Standards of Inmate Behavior" rule book, which is not always readily available to inmates. Tr. at 163, 399, 546. Once she obtains a copy of the rule book, the inmate is not necessarily much better informed of the nature of the charges against her. The prohibited behavior to which the code number refers is often general and ambiguous. For example, 1.25 is "disturbance, creation, participation, or inciting others to participate (threat to security or order); 3.00 is "any violation of posted and distributed local facility rules or procedures." A particularly troubling example of the generality of the code numbers is 1.90—"refusing to obey a direct order." The inmate may have no knowledge of which order is involved.

These categorical definitions of inmate offenses do not satisfy the notice requirement set forth in *Wolff* and embodied in our order. The purpose of the notice requirements is to inform the inmate of the charges and enable her to marshall the facts and prepare a defense. *Wolff v. McDonnell, supra,* 418 U.S. at 564, 94 S.Ct. at 2978. An inmate gains little insight into the nature of the charges and factual allegations against her from knowledge of the offense category with which she is charged. One prison official testified that different officers may interpret the rules differently, so that the inmate is not always sure of the nature of the charges against her, tr. at 58–60. If an inmate is unable to obtain access to an inmate rule book, it is possible

---

the Adjustment Committee can impose one week of keeplock or detain an inmate in the Special Housing Unit pending a determination of the Superintendent's Proceeding warrants the application of *Wolff v. McDonnell,* to Adjustment Committee Proceedings. *See McKinnon v. Patterson, supra* at 938; *Powell v. Ward,* 542 F.2d 101 (2d Cir. 1976); *Crooks v. Warne,* 516 F.2d 837 (2d Cir. 1975); *United States ex rel. Larkins v. Oswald,* 510 F.2d 583 (2d Cir. 1975).

9. Furthermore, if the Adjustment Committee recommends that a Superintendent's Proceeding be held, a procedure that is required when

an inmate is confined in the special housing unit, the reports and records of the Adjustment Committee are deemed "incorporated into the record of the [Superintendent's] Proceeding and may be considered by the person conducting the proceeding without the necessity of formally reading same into the record." 7 NYCRR § 253.4(d). This possibility that the Adjustment Committee Proceedings could be used in the Superintendent's Proceeding as a basis for the imposition of a substantial period of isolation provides further support for the necessity of providing *Wolff v. McDonnell* safeguards for the Adjustment Committee.

that she would have no knowledge of the nature of the charges against her until the proceeding itself. To rely on the inmate's knowledge of the incident in which she was involved as the basis for adequate notice, as suggested by the defendant, tr. at 402, would severely undercut the constitutionally mandated principle of due process on which the notice requirement is based. *See Wolff v. McDonnell*, 418 U.S. at 572, 94 S.Ct. at 2982. Therefore, we find that the form of notice currently provided to inmates facing Adjustment Committee Proceedings does not comply with the notice requirements of the order.

There was also some testimony indicating that inmates do not always receive the notice of hearing twenty-four hours in advance. As a general practice, inmates are provided with the notice of report at least twenty-four hours in advance, but several inmates testified that they did not receive notice until the hearing began, tr. at 105, 165, 177–78, and there was testimony indicating that, on occasion, an additional charge was added at the hearing, without prior notice to the inmate, tr. at 178. However, in light of the inadequacy of the notice actually provided, the inmates due process rights have not been significantly altered by the timing of the notice.

The established procedure for notifying inmates facing Superintendent's Proceedings of the charges against them is to provide a Superintendent's Proceeding Formal Charge at least twenty-four hours before the hearing is scheduled. This form notifies the inmate that a charge has been filed and a Superintendent's proceeding has been scheduled, furnishes the name and title of the official who will preside, and provides a space in which to state the code number and category of the charge and specify the factual basis for that charge. The evidence presented indicates that the inmates are generally provided with sufficiently detailed notice to satisfy the requirements of our order. The officer involved generally includes a factual description of the incident leading to the charges. *See, e. g.,* Exhibit HHHHH. There was evidence, however, that on several occasions defend-ant failed to provide any notice, or that the terms of the notice provided were so vague and ambiguous that the inmate would not reasonably be expected to ascertain the conduct at issue. *See, e. g.,* tr. at 132. Notice to Luz Santana, Exhibit T (inmate charged with "planning to start something in the yard" and "meeting attorneys to participate in whatever").

Similarly, although the defendant, as a general matter, does provide notice at least 24 hours before the proceeding, there were instances where charges were added at the hearing, or where the inmate did not receive formal charges until the hearing. *See* dep. tr. at 52; testimony of Anderson at 50; Harris tr. at 234.

*Witnesses*

Paragraph 1(b) provides that:

The inmate shall be permitted to call witnesses on her behalf provided that so doing does not jeopardize institutional safety or correctional goals. The written notice of charges served in accordance with paragraph 1(c) shall inform the inmate of her right to call witnesses.

It is undisputed that inmates are not permitted to call witnesses to testify in their presence at a hearing. Tr. at 433 and 570. Inmates facing Superintendent's Proceedings have the right to request the Hearing Officer to interview witnesses outside the presence of the inmate. Tr. at 412–413. The interviews with inmates are tape recorded, but not transcribed. Inmates requesting witnesses are not permitted to hear the tape, tr. at 571. The general policy is to inform inmates of their right to request that witnesses be interviewed by typing the following statement on the Formal Charge: "The inmate shall be permitted to call witnesses on her behalf provided that so doing does not jeopardize institutional safety or correctional goals." Plaintiff's Exhibit 15.

The evidence presented at the hearing shows that the practice has deviated somewhat from the policy just described. In a number of instances, the formal charge failed to inform the inmate of the right to

call witnesses, *see, e. g.* tr. at 53, Exhibits 10, 24, 27, 45, UUUU, and several inmates testified that they were never notified of that right. *See, e. g.* tr. at 42, 102, 199. The Deputy Superintendent for Security testified that a request for witnesses was never denied on the basis that the testifying inmate would jeopardize institutional security or correctional goals. Tr. at 603. Witness interviews appear to have been denied because the inmate pleaded guilty to the charges, tr. at 631, and because the interviews were determined to be unnecessary, irrelevant or cumulative, tr. at 103, 431, 631. One inmate testified that she was asked to select the most pertinent witness, and only that one would be interviewed, tr. at 574, 604, 632; Exhibits 37 and 38.

The policy and practice regarding witnesses in Adjustment Committee Proceedings reflects defendants' erroneous assumption that our order does not apply to Adjustment Committee Proceedings. The Superintendent testified that inmates do not have the right to call witnesses at Adjustment Committee Proceedings, tr. at 433. Not surprisingly, the notice of hearing does not inform witnesses of this right. Several inmates testified that they did not know that they could call witnesses for Adjustment Committee Proceedings, tr. at 31, 162, 251. It is unclear from the record whether defendants have interviewed witnesses in the event an inmate facing Adjustment Committee Proceedings does make a request.

There is no question that the failure to notify inmates that they may call witnesses to testify in their behalf is a clear violation of our order. To the extent that the defendant has denied any witnesses in Adjustment Committee Proceedings, these actions also constitute non-compliance.

Plaintiffs also contend that defendants' refusal to allow witnesses to testify at the hearing in the presence of the inmate constitutes a violation of our order. Defendants argue that the order requires only that witnesses be interviewed. The current poli-cy is to interview witnesses outside the presence of the inmate. The interviews are tape recorded. There was testimony indicating that the tape recorder is turned on and off during the hearing. We are also troubled by evidence that the witness is cross-examined, rather than questioned. Tr. at 44, 81. Inmates do not normally receive transcripts of the hearing, nor are they permitted to hear the tape. Tr. at 48. The interview is not incorporated into the record of the hearing.

The issue of whether the order requires witnesses' presence at hearings has caused some confusion on prior occasions. *See Powell v. Ward*, Memorandum Decision, April 9, 1975. Before we can determine whether the current practice satisfies the requirements of our order, it is necessary to clarify the meaning of the provision concerning the right to call witnesses.[10] In *Wolff v. McDonnell, supra*, the Supreme Court held that

"the inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals. Ordinarily, the right to present evidence is basic to a fair hearing; but the unrestricted right to call witnesses from the prison population carries obvious potential for disruption and for interference with the swift punishment that in individual cases may be essential to carrying out the correctional program of the institution. . . . [h]ere we must balance the inmate's interest in avoiding loss [of good time] against the needs of the prison, and some amount of flexibility and accommodation is required."

*Wolff v. McDonnell*, 418 U.S. at 566, 94 S.Ct. at 2679.

We are not persuaded that *Wolff* supports a blanket policy against allowing witnesses to be present at the hearing. The Court appears to have contemplated individualized determinations of the potential

---

10. In light of the uncertainty surrounding this aspect of the order, any related finding of non-compliance will not be consideration as a basis for contempt.

threat to security created by the presence of the inmate at the interview. True, prison administrators are to be given broad discretion in determining whether such a threat exists. *Wolff* at 566, 94 S.Ct. at 2979. But administrative necessity does not require a blanket rule which precludes the presence of witnesses when there are no countervailing concerns warranting that prohibition. Requiring prison officials to determine on an individual basis whether witnesses can be present encourages them to exercise their discretion to strike the appropriate balance between the prisoner's right to call witnesses and the prison's need to maintain order.

This determination takes on added significance when considered in conjunction with the policy at Bedford Hills concerning investigations. If an inmate requests that witnesses be interviewed, her disciplinary proceeding is adjourned until those interviews have been completed. Inmates held in segregation pending the outcome of the hearing, have been held in segregation for as long as sixteen days while their witnesses are interviewed. By allowing witnesses to appear at the hearing in appropriate situations to be determined by the prison officials according to their discretion, the hearing process is likely to be expedited.

When it is determined that possible hazards to institutional safety or correctional goals preclude a witness' presence at the hearing, the prison officials may interview her out of the presence of the inmate. However to enable the inmate to present a defense, she should, under ordinary circumstances, be permitted to listen to the tape or read the transcript, unless the prison officials determine that this would also jeopardize institutional safety or correctional goals. One inmate, Robin Anderson, didn't even know whether requested witnesses had been interviewed. Tr. at 43. This procedure would also reduce the possibility of inaccuracies in the description of witness' testimony to inmates, a problem which arose in a disciplinary proceeding involving Carol Crooks. *See* Exhibit P.

In sum, to comply with section 1(b), witnesses must be allowed to be present at disciplinary proceedings, unless the appropriate officials determine that this would jeopardize institutional safety or correctional goals.[11] If an inmate is not permitted to have witnesses present, the interview may be conducted out of her presence and tape recorded. The tape or transcript of the interview, which is to be considered part of the record of the hearing, is to be made available to the inmate prior to or at the hearing, unless prison officials determine that this too would jeopardize institutional safety or correctional goals. In either case, a written explanation of the denial of witnesses is to be given to the inmate.

Plaintiffs also argue that defendant violated our order by limiting the number of witnesses to be interviewed. There was testimony that prison officials had, on occasion, denied all of an inmate's requests for witnesses, or required an inmate to select the most pertinent witness, tr. at 574–75. These decisions do not fall within the exception in the order to the requirement that inmates be permitted to call witnesses to testify in their behalf, and no other justification for denying witnesses was provided. Contrary to plaintiffs' contention, this does not mean that prison officials may not limit the number of witnesses to be called under any circumstances. If an inmate requests an unreasonable number of witnesses, and prison officials determine that some of these witnesses are cumulative, witnesses may be excluded on that ground. Witnesses may also be excluded if the hearing officer determines that their involvement will jeopardize institutional safety or correctional goals.

*Written Explanation of Denial of Request for Witnesses*

Section 1(c) of the order provides

If permission to call a witness is denied, the party conducting the hearing shall give the inmate a written statement stating the reasons for the denial, including

---

11. The Department of Corrections and the former superintendent of Bedford Hills interpreted our order and *Wolff* to require the presence of witnesses. *See* Exhibits 21 and 24.

the specific threat to institutional safety or correctional goals presented by the witness.

It was not disputed that statements of the reasons for denying requests for witnesses have not been given to inmates, tr. at 603. One prison official testified that they did not believe the written statement was necessary because witnesses had never been denied on the grounds that they presented a threat to institutional safety or correctional goals. Contrary to defendant's contention, the requirement of a written statement is not restricted to denials based on institutional safety or correctional goals, but requires a written statement whenever a request for witnesses is denied. Defendant's failure to give inmates written statements of reasons for the denial of witnesses is another instance of non-compliance with our order.

*Written Statement of Evidence and Reasons for Disposition*

Section 1(d) of the order states:

At the conclusion of the hearing, the inmate shall be given a written statement of the evidence relied on and the reasons for any action taken.

Inmates are not given any written disposition after an Adjustment Committee Proceeding, tr. at 31, 106, 168, 252, 464. The current practice is to inform the inmate orally of the discipline imposed and to forward a written report of the charges and the decision to the Deputy Superintendent of Security and the prison service unit for inclusion in the inmate's files. This procedure does not satisfy Section 1(d) of the order.

The general practice in Superintendent's Proceedings is to provide inmates with a Superintendent's Hearing Statement of Evidence and Reason for Disposition. When the presiding official properly completes the form and gives it to the inmate at the completion of the hearing, this procedure complies with Section 1(d) of the order. On at least some occasions, however, inmates have not received this statement at all, or have received them well after the hearing was terminated, tr. at 35, 57 and 272. For instance, Luz Santana stated that she had not received any written dispositions after three separate Superintendent's Proceedings, and Robin Anderson received her written statement four months after the hearing, after several requests.

The completed statements of evidence relied upon submitted to the Court by both parties indicate that the forms themselves are inadequately completed. As plaintiffs point out, the statement of evidence relied upon most often consists of a list of the source of the information presented to the hearing board. For example, one statement lists as evidence relied upon "misbehavior reports, discussion at Superintendent's Proceeding. Interview with Sgt. Pompellone re: charges and information re: C. O. Young and inmate Robin Anderson." Another statement merely says "reports from C. O. Stephen and C. O. Young." This information does not "protect the inmate against collateral consequences based on a misunderstanding of the nature of the original proceeding." *Wolff v. McDonnell*, 418 U.S. at 565, 94 S.Ct. at 2979. Nor is the inmate likely to be aided in "propounding his own cause or defending himself to others," *id.*, especially because the inmate does not have access to some of the reports upon which the decision may be based.

Some of the statements of the reason for the disposition also fail to adequately inform the inmate and other decision makers who may rely on this information of the basis of the decision, although hearing officers were more thorough in providing this information than the statements of evidence. In some instances, however, the hearing officer merely restated the offense the inmate was found to have committed. *See, e. g.* Exhibit 12, p. 5; Exhibit JJJ; Exhibit 39.

The Department of Corrections aptly set forth the degree of specificity necessary to comply with our order:

In order to comply with *Powell v. Ward*, it will be necessary to detail the evidence. Evidence can basically be described as the facts which tend to prove or disprove the

charges presented. Furthermore, it will be necessary to give the reasons for the action taken (disposition). In other words, the rationale for a particular restriction, confinement, or other penalty being imposed [sic].

Exhibits 23 and 24, Memo. As of now, the responsible officials have not consistently met this standard.

*Membership of the Hearing Committee*

Section 1(e) of the order provides:

No person who has participated in any investigation of the acts complained of, or who was a witness to those acts shall be a member of any Adjustment Committee or Superintendent's Proceeding relating to those acts.

On occasion, officers who were involved in the incident underlying the charge were also a member of the disciplinary board in that case. For example, Carol Crooks testified that the officer presiding over her hearing of December 20, 1977 was involved in the relevant incident, tr. at 650. On the basis of the record, it is difficult to assess the degree of such non-compliance. We note that the policy that the Adjustment Committee investigates any incident that comes before them, 7 NYCRR § 253.4; tr. at 569, is likely to increase the likelihood that an involved official will preside over a related disciplinary proceeding.

There is a more general problem with the current policy of allowing members of the Adjustment Committee or Superintendent's Hearing to investigate the incident, a policy which is embodied in the department's regulations. *See* 7 NYCRR § 253.3, 253.4; tr. at 569. There was testimony that the person who assists the inmate at the hearing is authorized to conduct the investigation as well. Whether or not these people actually performed that function, the evidence establishes that the hearing officers do conduct investigations. This procedure is in direct conflict with Section 1(e) of the order.

Nor is this problem of non-compliance remedied by the procedure adopted by the defendants, apparently to avoid changing their policy, of postponing the investigation until after the hearing is commenced, tr. at 465, Exhibit 30.[12] Our concern in issuing this provision was that the hearing officer remain impartial, *Holfield v. Power Chemical Company, Inc.*, 382 F.Supp. 388, at 392. The formality of convening and adjourning the disciplinary proceedings does not diminish the possibility that an investigation of the incident by the hearing officer may affect his or her neutrality in rendering a disposition.

We do not as a matter of general principle, consider interviews of witnesses requested by an inmate conducted out of her presence and tape-recorded to constitute investigations within the meaning of our order. These interviews would ordinarily be conducted by the hearing officer at the proceeding. It was reasonable under the circumstances for the prison officials to treat witness interviews as part of the hearing, and to the extent that current practices create the possibility of bias or unfairness, these problems are more appropriately addressed in the section dealing with the inmate's right to call witnesses in her behalf.

*Hearing Within Seven Days of Confinement*

Section 2 of the order as modified by the Court of Appeals provides:

If any inmate is confined to Special Housing or Segregation "pending investigation" of charges, a hearing must be held within seven days of the date of her confinement. In unusual or emergency situations, the seven-day requirement may be extended but only with the permission of the Commission of Correctional Services or his designee.

Adjustment Committee Proceedings and Superintendent's Proceedings are generally commenced within seven days of the inmate's confinement, although there were isolated instances in which the hearing was

---

**12.** This practice has resulted in problems relating to the defendant's compliance with the requirement of a hearing within seven days of confinement. Inmates have been confined for substantial periods "pending investigation" of the requested witnesses.

opened later. For example, Robin Anderson's Superintendent's Proceeding was initiated a day late, tr. 625, Exhibits SS and TT.

However, a serious problem concerning confinement "pending investigation" remains. In a number of instances, the hearings were not completed within seven days of confinement. For example, Robin Anderson was confined for 13 days and then acquitted of the charges; another inmate was in SHU for 16 days before a disposition was rendered, tr. at 264; Luz Santana was confined for 15 or 16 days before a disposition was rendered, tr. at 519. *See* Exhibit 44. In none of these cases did prison officials obtain the permission of the Commissioner based on the existence of exigent circumstances.

Defendant argues that our order requires only that the hearing be opened within seven days. We do not agree. We originally found in *Powell v. Ward* that inmates were being confined "pending investigation" for significant periods of time. As we stated earlier, the fact that a hearing is convened and adjourned "pending investigation" does not alter the pivotal fact that inmates are subject to confinement for substantial periods before any determination is made that such confinement is required. The order, as modified, provides prison officials with the flexibility necessary to deal with unusual or emergency situations, and still protects inmates' due process rights. It becomes particularly important to ensure swift disposition of cases where the inmate has been confined pending a determination in light of the practice at Bedford Hills of fairly routinely confining inmates following incidents leading to disciplinary proceedings.[13]

Therefore, we find that defendant's failure to complete proceedings within 7 days of the inmate's confinement constitutes a violation of Section 3 of the order.

*Failure to Provide Interpreters for Spanish Speaking Inmates*

■ Plaintiffs contend that the defendant's failure to provide Spanish speaking inmates with notice and statements in Spanish violates Sections 1(a) and 1(d) of the order. It was not disputed that notice and statements are given only in English, tr. at 463–64. Several inmates testified that they did not speak or understand English, and that they could not understand the notice or statements given to them, nor could they understand fully what went on at the hearing, tr. at 130–134.

Although prison officials' responsibility to provide comprehensible notice to Spanish speaking inmates was not dealt with directly by the Supreme Court in *Wolff v. McDonnell, supra,* the Court's treatment of illiterate inmates is instructive. The Court required prison officials to provide an opportunity for aid to such inmates in understanding the written communications and aiding her at the hearing, 418 U.S. at 570, 94 S.Ct. at 2981. The emphasis was on enabling the inmate to comprehend the case so that she is able to collect and present evidence. These considerations are equally pressing in the situation currently before us. Unless Spanish speaking inmates understand and can communicate with the hearing board, they are being denied the due process protections guaranteed in *Wolff.* Therefore, we find that due process requires that Spanish speaking inmates who cannot read and understand English must be given notice and statements in Spanish or provided with a translator, who should be present at the hearing in any case.[14]

Accordingly, we find that defendant has failed to comply with our order requiring the institution of procedural safeguards in all disciplinary proceedings that may result in confinement of an inmate in segregation.

---

13. We recognize that prison officials may confine inmates without a hearing when the inmate is violent or otherwise threaten institutional security, as long as a hearing follows as soon as practicable. *See McKinnon v. Patterson,* 568 F.2d at 939 n.10.

14. In light of the fact that this requirement has not before been articulated, we do not consider defendant's non-compliance as support for the contempt motion.

*Contempt*

Plaintiffs have moved for a finding of civil and criminal contempt for failure to comply with the order.

 "Broadly speaking, a civil contempt is a failure of a litigant to do something ordered to be done by a court in a civil action for the benefit of the opposing party therein." *Walling v. Crane*, 158 F.2d 80, 83 (5th Cir. 1946). "While a finding of civil contempt should follow only from 'clear and convincing proof', *NLRB v. Local 282, International Brotherhood of Teamsters*, 428 F.2d 994, 1001–02 (2d Cir. 1970); . . ., the violation need not be wilful to evoke such a remedial determination. *NLRB v. Local 282, supra* at 1001;" *Aspira of N.Y. v. Board of Education of City of New York*, 423 F.Supp. 647, 653–54 (S.D.N.Y.1976). The relevant question has been determined to be "whether defendants have been reasonably diligent and energetic in attempting to accomplish what was ordered." *Aspira*, 423 F.Supp. at 654, citing cases. Inability to comply, if shown clearly and categorically by defendants, is a valid defense to a civil contempt motion. *United States v. Bryan*, 339 U.S. 323, 330–34, 70 S.Ct. 724, 94 L.Ed. 884 (1950). However, "where the court determines that 'defendants violated their obligations under the decree by failures of diligence, effective control, and steadfast purpose to effectuate the prescribed goals,' contempt findings are in order." *Palmigiano v. Garrahy*, 448 F.Supp. 659, 670 (D.R.I.1978), *citing Aspira*, 423 F.Supp. at 651. In such cases, a finding of civil contempt is necessary "to preserve and enforce the rights of private parties to suits, and to compel obedience to orders and decrees made to enforce the rights and administer the remedies to which the court has found them to be entitled." *Palmigiano v. Garrahy*, 448 F.Supp. at 670, *citing In re Nevitt*, 117 F. 448, 458 (8th Cir. 1902).

 A finding of criminal contempt is punitive rather than remedial in nature, and is intended "to preserve the power and vindicate the dignity of the courts, and to punish for disobedience of their orders." *In re Nevitt*, 117 F. at 458. The Court, the U.S. Attorney or an attorney appointed by the Court for this purpose, may prosecute a criminal contempt motion. F.R.Crim.P., Rule 42(b). "Wilfulness . . . is an element of criminal contempt and must be proved beyond a reasonable doubt. *United States v. Greyhound Corp.*, 508 F.2d 529, 531 (7th Cir. 1974). There must be shown to be "a volitional act done by one who knows or who should reasonably be aware that his conduct is wrongful." *Id.* at 531–32.

In the case before us, we are concerned first and foremost with achieving and maintaining disciplinary proceedings which are in accordance with the constitution. Continued non-compliance prolongs the harm to inmates caused by deprivation of fundamental rights without due process of law. We have found that the defendant has failed to comply in significant respects with virtually every provision of our order. This is not the first time it was necessary to hold that the procedures employed at Bedford Hills did not comply with our order. We are troubled by the defendant's lack of diligence and commitment in taking the steps necessary to achieve compliance.

The defendant's treatment of the court order as it applies to Adjustment Committee Proceedings is the most obvious and disturbing instance of the defendant's lack of reasonable diligence. The original opinion explicitly addresses and resolves the question of the applicability of our order to Adjustment Committee Proceedings. The accompanying order unambiguously applies to Adjustment Committee Proceedings. There was no appeal from the provision, nor was there any request for reconsideration or modification. The defendant determined, apparently unilaterally and in the face of contrary views of her predecessors and superiors, that the language and spirit of the order could be ignored. This action strongly influences our view that the defendant was not reasonably diligent in complying or even attempting to comply with our order.

This determination is further evidenced by the defendant's response to the provi-

sions of the order requiring an impartial hearing officer and a hearing within 7 days of confinement. The interpretations proposed by the defendant strain both the language and intent of the order. We are left with the impression that, rather than making all reasonable efforts to afford inmates the required due process protections, the defendant instituted superficial changes in policy that cut off consideration of the necessity of altering basic practices to comply with the letter and spirit of the order.

Our view is not altered by the fact that Superintendent Curry "consulted with her attorney", "searched for relevant material," and "called a staff meeting with her three Deputy Superintendents", at which the Superintendent went over the Order "point by point". The most troubling areas of non-compliance stem not from failure of staff to comply with valid procedures, but from those procedures adopted by the defendant that contravene the provisions of the order. Furthermore, although the defendant's efforts certainly indicate that she was concerned about the possibility of non-compliance, these efforts do not satisfy her responsibilities "to marshall [available resources], assert [her] high authority, and demand the results needed from subordinate persons . . . in order to effectuate the course of action required by the [order]." *Aspira*, 423 F.Supp. at 654. Her responsibility did not end with the delegation of duties, nor was it sufficient to follow up "by reviewing the papers in Superintendent's Proceedings to the extent she had time available." Defendants' Memorandum of Law at 30.[15] More active involvement and supervision was and is necessary to bring about a change in procedures that are basic to the prison routine.

We are also disturbed by the defendant's apparent ignorance of the existence of our order until September 1978.* Although Superintendent Curry was not personally involved in defendants' compliance efforts from the outset, the Superintendent at Bedford Hills assumed responsibility for achieving compliance with our order from the time the order was entered. We do not question Superintendent Curry's good faith, but the inevitable succession of officials in public office does not excuse non-compliance. *See Palmigiano v. Garrahy*, 448 F.Supp. at 673.

This is not a case in which the defendant has demonstrated inability to comply with our order. Bedford Hills had a pre-existing duty to institute many of the procedures required by our order. There was no showing of undue hardship or inadequate resources to comply with the order.

For these reasons, we are forced to conclude that the defendant was not "reasonably diligent" in attempting to comply with the June 23, 1975 order. We decline to find that defendant's non-compliance was wilful, and we do not intend to punish the defendant for her failure to achieve compliance. Our finding of civil contempt is solely remedial in purpose. Defendant's failure to maintain minimum procedural safeguards in the face of a court order not only deprives plaintiffs of their constitutional rights, but is also likely to contribute to their sense of the arbitrariness of disciplinary proceedings which due process safeguards are intended to reduce. We therefore conclude that a sanction and related relief is necessary.

*The Remedy*

"Generally, the sanctions imposed after a finding of civil contempt serve two functions: to coerce future compliance and to remedy past noncompliance. *See generally United States v. United Mine Workers*, 330 U.S. 258, 302–04, 67 S.Ct. 677, 91 L.Ed. 884 (1947). . . . . So far as the first of these functions is concerned, the district judge sitting in equity is vested

---

15. There was reason for concern because memoranda in defendant's files from the Departmental Review Board indicated that current practice did not conform to our order. *See* Exhibits 21, 23, 24, 25.

* Phyllis Curry assumed the position of Superintendent at Bedford Hills in December, 1977.

with wide discretion in fashioning a remedy." *Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, 130 (2d Cir. 1979). In assessing the appropriate character of the remedy, we "must then consider the character and magnitude of the harm threatened, and the probable effectiveness of any suggested sanction in bringing about the result desired." *United States v. United Mine Workers*, 330 U.S. at 304, 67 S.Ct. at 701.

We have already discussed the irreparable harm caused plaintiffs by the continuing deprivation of their constitutional rights. It is almost five years since the order was first issued, and the due process violations that were enjoined at that time are still widespread. We conclude that a fine is necessary to demonstrate to the defendants the seriousness with which we view their continued non-compliance and to generate the effort necessary to bring about prompt and meaningful compliance with our order and the Constitution. We will therefore impose on defendant Curry in her capacity as Superintendent of Bedford Hills Correctional Facility a fine of 5,000 dollars to be paid one month from the date of entry of our order, and 1,000 dollars thereafter for every additional day that the defendant is not in substantial compliance. The contempt finding may be purged if defendant achieves compliance with our order within that 30-day period. In that event, the Court may quash the contempt citation and revoke the fine. *Palmigiano v. Garrahy*, 448 F.Supp. at 672; *Hamilton v. Love*, D.C., 358 F.Supp. 338, 348; 361 F.Supp. 1235 (D.Ark.1973).

Defendant's ignorance of the existence of the order until September of 1978 and apparent lack of concern for the actual state of compliance efforts over the last few years leads us to conclude that the appointment of a special master is warranted to oversee the compliance process and to report to the Court on a periodic basis concerning defendant's progress. Courts have inherent authority to appoint nonjudicial officers to aid in carrying out their judicial functions. *See Ex Parte Peterson*, 253 U.S. 300, 40 S.Ct. 543, 64 L.Ed. 919 (1919). In addition, Rule 53, F.R.Civ.P., establishes a statutory basis for the appointment of a master. Masters have been used in the prison context, when prison officials were unable or unwilling to comply with a court order, to provide expert assistance, to serve as a visible reminder of the court's jurisdiction, and to serve as "the eyes and ears of the Court." *Palmigiano v. Garrahy*, 443 F.Supp. 956, 986 (D.R.I.1977); *see also Jordan v. Wolke*, 75 F.R.D. 696 (E.D.Wis.1977); *Jones v. Wittenberg*, 73 F.R.D. 82, 85 (N.D. Ohio 1976). We think that compliance efforts here will be expedited by the appointment of a master to monitor compliance until we are satisfied that the due process protections required by our order have been incorporated into the prison routine. Therefore, the parties are to include in the proposed order to be submitted hereunder provisions specifying the duties and powers of the master.

The imposition of the fine and appointment of the master serve the function of achieving future compliance. It remains "to make reparation to the injured party and restore the parties to the position they would have held had the injunction been obeyed." *Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d at 130. "The court 'has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future.'" *Carter v. Jury Commission*, 396 U.S. 320, 340, 90 S.Ct. 518, 529, 24 L.Ed.2d 549 (1970). Where, as here, there is likely to be continuing effects from the use of records of unconstitutional disciplinary proceedings,[16] and plaintiffs' due process rights were clearly established at the time the violations occurred, it is appropriate to require the expungement of the records of all disciplinary proceedings conducted in violation of our order. *See Chapman v. Pickett*, 586 F.2d 22 (7th Cir. 1978); *Ware v. Heyne*, 575 F.2d 593 (7th Cir. 1978); *McKinnon v.*

---

**16.** These records are relied upon in making a range of decisions concerning inmates' future rights and privileges, e. g., parole, furloughs, visitations.

*Patterson,* 568 F.2d 930 (2d Cir. 1977). We have found that defendant's policy and practice concerning Adjustment Committee Proceedings violates the provisions of our order, and that some practices in Superintendent's Proceedings violated our order as well. These findings relate to events which followed an earlier expungement order issued on June 24, 1977 to remedy violations occurring prior to that time. Therefore, for disciplinary proceedings since June 24, 1977, defendant is to expunge the records of all Adjustment Committee Proceedings and in addition, those Superintendent's Proceedings that plaintiffs demonstrate to the Special Master have been conducted in violation of the order. The Special Master appointed in this case shall hold hearings on this issue, and report to the Court concerning his findings and recommendations.

■ Plaintiffs also seek damages to compensate for injury suffered as a result of violations of the order. Plaintiffs who have suffered harm because of a violation of the terms of a decree are to be awarded damages to the extent they are established. *Vuitton et Fils S.A. v. Carousel Handbags,* 592 F.2d at 130. Although defendant is entitled to the qualified immunity accorded officials in *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) and *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), the immunity defense is unavailing here, where "the constitutional right allegedly infringed was clearly established at the time of [her] challenged conduct," "she knew or should have known of that right, and [she] knew or should have known that [her] conduct violated the constitutional norm." *Procunier v. Navarette,* 434 U.S. 555, 562, 98 S.Ct. 855, 860, 55 L.Ed.2d 24 (1978).

■ To recover damages in a civil contempt action, plaintiffs must show that they suffered actual injury. Damages are not "presumed to flow from every deprivation of procedural due process." *Carey v. Piphus,* 435 U.S. 247, 263, 98 S.Ct. 1042, 1052, 55 L.Ed.2d 252 (1977). Moreover, injury caused by a justified deprivation, including distress, does not justify awarding compensatory damages. 435 U.S. at 264, 98 S.Ct. at 1052.

Here, a significant portion of the harm to plaintiffs will be remedied by our order requiring the expungement of records of disciplinary proceedings that violated our order. With respect to the mental and emotional harm allegedly suffered by plaintiffs, there has not been a sufficient showing of injury actually suffered by individuals whose due process rights were violated. Although plaintiffs argue in their memorandum that such harm occurred, little if any testimony concerning actual injury was presented. Furthermore, there is a question as to which members of the class are actually seeking damages (e. g. the entire class, the inmates who testified at the hearing, those who submitted affidavits).

■ Even though plaintiffs have not shown actual injury sufficient to support a substantial damage award, they are entitled to a nominal award to vindicate the deprivation of their rights, because of the "importance to organized society that procedural due process be observed." *Carey v. Piphus,* 435 U.S. at 266, 98 S.Ct. at 1054. Respondents are thus entitled to nominal damages not to exceed one dollar from defendant.

*Attorneys Fees*

■ Plaintiffs have requested attorneys fees for services performed in litigating this motion. Under the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, in an action to enforce a provision of 42 U.S.C. § 1983 "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee." We find that plaintiffs' counsel is entitled to recover fees in this case. *See Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); *Mid-Hudson Legal Services, Inc. v. G. & U., Inc.,* 578 F.2d 34 (2d Cir. 1978). Counsel shall submit affidavits in accordance with the standards set forth in *City of Detroit v. Grinnell Corp.,* 495 F.2d 448 (2d Cir. 1974) and *Beazer v. New York Transit Authority,* 558 F.2d 97 (2d Cir. 1977).

*Conclusion*

We have found that defendant failed to comply with our order, that plaintiffs have been irreparably harmed and that the harm is of a continuing nature such that injunctive relief is necessary. Therefore, the preliminary injunction entered on June 23, 1975 shall constitute permanent injunctive relief.

Plaintiffs are directed to submit an order in ten days. Defendants may submit objections thereto and any proposed counter-order five days thereafter.

So ordered.