**HASAN JAMAL ABDUL MAJID, a/k/a Ronald Burgin, Abdul Ash Ahahid, a/k/a Raymond Franklin, Hasan Abdul Haqq, a/k/a John Ebbs, Muhammad Rahman, a/k/a El Bean, inmates of Auburn Correctional Facility individually and on behalf of all other persons similarly situated, Plaintiffs,**

v.

**Robert HENDERSON, Superintendent of Auburn Correctional Facility; and Benjamin Ward, Commissioner of New York State Department of Correctional Services, Defendants.**

No. 75–CV–341.

United States District Court,
N. D. New York.

March 11, 1982.

ground that the acts complained of were lawful.

The Legal Aid Soc. Prisoners' Rights Project, New York City, for plaintiffs; William E. Hellerstein, Ellen E. Levine, Dori A. Lewis, New York City, of counsel.

Robert Abrams, Atty. Gen., of the State of N. Y., Albany, N. Y., for defendants; James G. McSparron, Asst. Atty. Gen. In Charge, David B. Roberts, Daniel L. Saxe, Asst. Attys. Gen., Albany, N. Y., of counsel.

MUNSON, Chief Judge.

## MEMORANDUM–DECISION

The plaintiff class of Sunni Muslim inmates at the Auburn Correctional Facility seeks to enjoin the transfer of their religious leader, or Imam, Shuaib Abdur Raheem. The plaintiffs claim that Mr. Raheem is being transferred in retaliation for the practice and advocacy by Raheem of religious liberties and of access to courts. Additionally, the plaintiffs contend that the disciplinary placement of Mr. Raheem in the Segregation Housing Unit [SHU] at the Auburn facility was in violation of State law and of principles of due process. A hearing was held on December 9, 10, 11, and 15, 1981, with respect to these arguments.

On February 22, 1982, this Court filed an Order denying the plaintiffs' application for preliminary and permanent injunctive relief. This Memorandum-Decision sets forth the bases for this disposition.

### I.

Among the 1661 inmates presently incarcerated at the Auburn Correctional Facility, a maximum security institution, approximately 50, or roughly 4%, hold themselves out to be Sunni Muslims. Because they are a sect of the Islamic religion, Sunni Muslims follow the commandments of Allah, the sole deity; these commandments appear in the Holy Qur'an. Additionally, the Sunnis adhere to the commandments of Muhammad Ibn Abdullah, a prophet of Allah; Muhammad's teachings appear in the Hadith, a book of tradition. Each Sunni community is headed by an Imam, who is elected, for life, by the community members because of his knowledge of Islamic tenets and of his leadership abilities. Following his election, the community members take an oath, or Ba'yah, to obey and support the Imam as long as he obeys the command-ments of the Qur'an and the Hadith, and as long as he is willing and able to serve as Imam.

In a prison setting, the Imam must strike a balance between his role as a spiritual leader and his status as an inmate. For example, the Imam is expected, in general, to provide spiritual guidance to community members, and, in particular, to lead the Friday afternoon religious, or jummuah, services, which would be held, ideally, in a mosque, or masjid. At these services, members must give absolute attention to the Imam. For this reason, noises or movements are discouraged because they are distracting. The presence of figures or other representations are disturbing during services because they are associated with idolatry. The presence of non-Muslims is also frowned upon.

Apart from providing spiritual guidance, the Imam also offers non-spiritual counseling, such as serving as an arbiter of disputes. An inmate Imam may also assist a community member adjust to prison life.

Because, in a prison setting, an Imam is also an inmate, a correctional facility, and especially a maximum security prison, may place restrictions upon an Imam's actions for reasons of security. At the Auburn facility, an Imam is not permitted to visit inmates in SHU, a protective custody and disciplinary unit, and cannot visit SHU inmates who have been hospitalized. Moreover, restrictions are placed upon an Imam's use of the telephone, as well as upon the financial resources available to the Imam and the Sunni community.

At least since 1975, when this lawsuit was commenced, the Sunni Muslim inmates at Auburn have voiced a number of concerns regarding the practice of their faith. The Auburn administration and the Ministerial and Family Services division of the Department of Correctional Services have responded to many of these concerns.

A member of the ministerial staff at Auburn has, for years, been designated by the office of the Commissioner of Ministerial Services to be an administrative liaison for

the Sunni Muslims, as well as for other religious groups. Until very recently, the resident chaplain at Auburn, Father James C. Enright, had served since 1978 as a liaison for the Sunni Muslims, the American Muslim Mission, the Quakers, and for the Catholic population. In this capacity, Father Enright had been responsible for the provision of resources for the Sunni services, and for ensuring that the needs of the Sunni community were otherwise met.

Correctional authorities have also secured for the Sunni Muslims copies of the Qur'an, Hadith, and other texts. During the fiscal year 1980–81, ending March 31, 1981, the Sunni Muslim population at Auburn received the largest per capita expenditures for supplies than any other religious group in the facility.

Despite these responses, by the end of 1980 there were other matters of concern to the Sunni Muslims at Auburn which had not been redressed. Furthermore, among the Sunni leadership there had been sentiments that their liaison Father Enright had been unresponsive to their needs.

In an apparent effort to show the Sunni Muslims that the administration desired to keep open the lines of communication, a meeting was held on January 30, 1981, between Mr. Raheem, who was not elected Imam until February, 1981; the Superintendent of the Auburn facility, Robert J. Henderson; and other persons. A number of issues were raised by Mr. Raheem at this meeting, including the closing of the Sunnis' masjid in 1979, which came as a result of a disturbance in the masjid during which access to the area by security personnel had been impeded. Since that time, the Sunni Muslims had held their jummuah services in the Chapel. At the January meeting, Mr. Raheem explained that the Chapel was not structurally suitable for their services. Mr. Raheem also stated that the Sunni community needed storage space.

In response to the requests put forth by Mr. Raheem, the Superintendent expressed his opinion that quarterly meetings between his office and the Sunni community might be useful in order to facilitate communication. Additionally, because the Sunni Muslims believed that the chaplaincy should be doing more for them, the Deputy Superintendent in charge of security, Robert Nelepovitz, assigned Lt. Matro to "open doors" which, by virtue of his authority, probably would not be open for Father Enright. In this regard, Lt. Matro expedited the request for storage space, and made the Chapel more conducive to the holding of Sunni services by securing the removal of a number of pews.

Shortly after his appointment, Lt. Matro left the facility. It was not until later in the summer that another individual, Sgt. Murphy, was assigned to the position. He too left, however, and presently no one holds the post.

Although in February, 1981, the Sunnis received an affirmative response from the administration in regard to a corrections officer's disruption of Sunni classes, the Sunni Muslims continued to press various concerns. In April, 1981, they filed a series of inmate grievances concerning, *inter alia*, access by the Imam to the SHU and the performance of daily prayer. On this last point, Mr. Raheem maintained that the Sunnis should be allowed to perform their prayers, during shop, for example, in an Islamic manner which involved prostration. At the hearing, Mr. Raheem testified that only where there are exigent circumstances, such as a life or death situation, or where a Sunni Muslim is riding in some mode of transportation, could a Muslim deviate from this manner of prayer. Superintendent Henderson denied all these grievances, noting on the question of prayer that an earlier Imam at the facility had represented that, during shop, prayer would be permissible in a sitting or standing position.

During part of the month of June, 1981, Mr. Raheem was in New York City, testifying in a trial. During his absence, the Sunni clerk, Richard Williams, also known as Kufanya, served as acting Imam.

Following his return in early July, 1981, Mr. Raheem was of the opinion that the situation regarding the chaplaincy had deteriorated. Mr. Raheem stated at the hearing

that Father Enright had expressed open hatred for the Sunni Muslims; had characterized a state law suit as meritless; and had stated at some time that the filing of suits and grievances would not help the Sunnis' relationship with the administration and might result in Mr. Raheem's transfer. Mr. Raheem also testified that once he had received unsolicited spiritual advice from Father Enright regarding the performance of daily prayer.

Although denying that he hated Sunni Muslims, or that he expressed a hatred for Sunni Muslims, Father Enright testified that he did express his opinion to Mr. Raheem that litigation was a less preferable way of dispute resolution than other means, and that litigation made communication difficult. The resident chaplain stated further that he mentioned to Mr. Raheem, based upon information he had received from a Muslim Imam employed by the Department of Correctional Services, that, on a bus, or when situations prevented prostration, Mr. Raheem could perform his prayers in an alternative manner. Additionally, Father Enright said that his relationship with Mr. Raheem generally seemed cordial and business-like. Finally, Father Enright noted that during Ramadan, the period of fasting during the month of July, he had made certain that the Sunnis' special dietary needs were met.

In August, 1981, the Sunnis ran into a problem concerning the appointment of a clerk to succeed Kufanya, who had resigned for financially-related reasons. Mr. Raheem nominated Richard Jones to fill the position. Father Enright, as part of his liaison responsibilities, interviewed Mr. Jones, and took his nomination to the Program Committee. The Committee, however, and Deputy Superintendent Nelepovitz, rejected Jones as a candidate, because his poor disciplinary record made him an unacceptable security risk. Father Enright then communicated the rejection to Mr. Raheem. Deputy Superintendent Nelepovitz also told Mr. Raheem of the rejection, and advised him to submit another nomination if he wished. It was not until October, 1981, that Mr. Raheem indicated to correctional authorities that he wished to discuss the reappointment of Kufanya.

Also in August 1981, Mr. Raheem secured a meeting with Father John R. LoConte, an Area Program Coordinator for Ministerial Services. Subsequently, Father LoConte filed a report of the meeting with the Assistant Director of Ministerial Services. As reflected in the report, it was Father LoConte's impression that Mr. Raheem had a perception of his Imam role as authoritative. Specifically, Father LoConte believed that Mr. Raheem regarded himself as having total authority over the religious affairs of the Sunni community. In this regard, Father LoConte opined that Mr. Raheem's perceived authority extended beyond religious affairs, and that the liaison necessarily had some authority over religious matters, such as control over scheduling, equipment, and inmate access to the jummuah services.

At some time in the early fall, unfounded rumors began to circulate that Mr. Raheem had threatened the life of Rev. Nussey, whom Mr. Raheem averred is held in high esteem by inmates. This rumor, Mr. Raheem stated, made him feel compelled to avoid any contact with the chaplaincy, because he feared possible actions by other inmates.

Around this same time, the facility altered the times when certain inmates could visit the commissary. This new schedule conflicted with the jummuah services, and affected some Sunni Muslims who needed to supplement their diets with purchases from the commissary.

Also, by September, 1981, there had not yet been any quarterly meetings between Mr. Raheem and prison authorities, as had been discussed at the January meeting. Due to scheduling problems, which had been communicated to Mr. Raheem, tentative meetings had been planned, and then cancelled.

In the wake of this apparent administrative action, or inaction, on September 25, 1981, Mr. Raheem sent a letter to Superintendent Henderson. The letter was typed

and edited by Kufanya, and a copy was sent to Rev. Dr. Moore. In the letter, Mr. Raheem characterized the administration as being insensitive, and as giving "tacit approval [to] religious persecution." He then proceeded to enumerate twelve "actions that demonstrate intentional persecution" of Sunni Muslims. These "actions" included the sufficiency of office space for the community, the closing of the masjid, and the mode of prayer. Mr. Raheem wrote that "[t]hese, and many other offenses collectively constitute a repression that is manifested in an obvious collision course between faithful Muslims and an antagonistic administration." The Imam further stated that the Sunni community no longer recognized either Rev. Nussey or Father Enright as liaison, and that, until another person was appointed to be liaison, they would regard themselves as "ostracized and condemned" by Superintendent Henderson, and would "function accordingly." Mr. Raheem also wrote, however, that the Sunni Muslims had no intent to violate any rules or regulations regarding the security of the institution. Finally, Mr. Raheem alluded that his letter might result in his transfer from the facility.

According to Mr. Raheem, he believed that the administration has a pattern of refusing to redress certain matters of concern to the Sunni community. By this letter, Mr. Raheem testified, he wanted to alert the Superintendent to what he believed to be a deteriorating situation. With respect to his reference to a transfer, Mr. Raheem explained that he thought he would be transferred for writing the letter.

Superintendent Henderson's reaction to the letter was one of surprise. The Superintendent stated that the letter, which he viewed as threatening, provocative, and insulting, seemed to come "out of the blue," and to be a radical departure from his prior cordial contacts with Mr. Raheem. Superintendent Henderson testified that nothing had preceded this letter, and expressed his belief that Mr. Raheem had wanted to provoke him to do an action that would promote the Sunni Muslims' litigation efforts. The Superintendent elaborated by stating that inmates know whom to write in order to get something done, and that, apparently, Mr. Raheem had been satisfied to deal with lower ranking officials instead of writing directly to him. On this point, Superintendent Henderson indicated that the letter exceeded the lines of propriety, and that, by authoring it, an inmate was "putting himself on the line."

Deputy Superintendent Nelepovitz shared the Superintendent's views about the letter, and expressed further his opinion that Mr. Raheem had not appeared to accept the rejection of the nomination of Mr. Jones. On the question of transfer, the Deputy Superintendent believed at the time of the receipt of the letter that a transfer would precipitate a great reaction on the part of the Sunni community.

Both Superintendent Henderson and Deputy Superintendent Nelepovitz had suspicions about the authorship of the letter. They held the view that, at least since Kufanya's tenure as acting Imam in June, 1981, Mr. Raheem had no longer acted alone, and had been placed under pressure. These officials believed that Kufanya was somehow behind this transformation, because it seemed to them that Kufanya always followed Mr. Raheem.

After sending the September 25 letter, Mr. Raheem carried out his expressed intent not to deal with the chaplaincy. He refused all contacts with Father Enright, even going so far as to refuse to obey an order by Father Enright to appear at the Chaplain's office, an apparent violation of the facility's rules or regulations. Like the administration of the facility, Father Enright regarded the actions of Mr. Raheem as a marked departure from earlier contacts. Also, according to Father Enright, Mr. Raheem's behavior interfered with his ability to serve as liaison for the Sunni Muslims.

On September 30, 1981, Superintendent Henderson replied to Mr. Raheem's letter. He stated that he would not respond to the "outrageous allegations" and "threats" in the letter, and that if Mr. Raheem had any

concerns, he should put them in a proper format.

On October 2, 1981, Mr. Raheem sent a response to the Superintendent's letter. Mr. Raheem asked the Superintendent to identify the allegations and threats, and suggested that "shame", instead of "insult," would have been a more appropriate reaction from the Superintendent. Finally, characterizing the September 30 letter as an avoidance of the issues raised in the September 25 letter, Mr. Raheem proposed that he and Superintendent Henderson should meet and discuss matters.

Around this same time, Superintendent Henderson became concerned about information he had received indirectly from inmates to the effect that revoluntionary doctrine was being taught during Sunni services. The Superintendent asked Deputy Superintendent Nelepovitz why the administration had not received any reports from officers assigned to monitor the jummuah services. In this regard, the Superintendent heard reports that no officers were inside the Chapel during the Sunni services.

Deputy Superintendent Nelepovitz assigned Lt. McCormick, a watch commander, and Sgt. John J. Burns, who had been responsible for the coverage of various religious services, to investigate the situation, and, in particular, to draw up a memorandum regarding security policies and procedures at Sunni services. Sgt. Burns duly submitted a memorandum, writing that two officers provided coverage of the services, and positioned themselves to conduct visual and auditory surveillance during the services without interrupting the program. Sgt. Burns did not state in the memorandum that he had made no first-hand observations of Sunni services in the Chapel. At the hearing, Deputy Superintendent Nelepovitz testified that the general policy of the facility was that at least one officer would be inside all religious services at all times.

Thereafter, on October 13, 1981, Superintendent Henderson responded to Mr. Raheem's letter of October 2. The Superintendent wrote that if Mr. Raheem desired a meeting, he should submit an agenda for the Superintendent's consideration. The next day, October 14, 1981, Mr. Raheem sent an agenda to the Superintendent and asked him not to include Rev. Nussey or Father Enright in any initial meeting. The presence of these persons, Mr. Raheem asserted, would "nullify the purpose of the meeting."

Also on October 14, 1981, Mr. Raheem dispatched a letter to Rev. Dr. Moore. He told Rev. Dr. Moore that the Sunni Muslim community at Auburn felt persecuted, and requested Rev. Dr. Moore to intervene and arbitrate matters at the facility, in order to avert a "serious confrontation." Upon receipt of the letter, Rev. Dr. Moore asked Father LoConte to make arrangements to travel to Auburn and investigate the situation.

Superintendent Henderson submitted a reply to Mr. Raheem's letter of October 14 on October 21, 1981. The Superintendent wrote that because Mr. Raheem had placed conditions upon whom could attend the proposed meeting, he would have to refer the matter to the Albany office before he could respond.

On the morning of October 23, 1981, Father LoConte arrived at the Auburn facility at the behest of Rev. Dr. Moore to carry out a fact-finding mission. Upon his arrival, Father LoConte went to Father Enright, who in turn told corrections officers to inform Mr. Raheem that Father LoConte wished to meet with him in Father Enright's office. Mr. Raheem communicated to Father LoConte, however, that he would attend the meeting only if Kufanya were present. Father LoConte reluctantly acceded to Mr. Raheem's request. At the hearing, Father LoConte opined that it was unusual that an Imam would need a "witness," and that perhaps Mr. Raheem wished to reinforce his credibility in the community and keep a record of statements made in the meeting.

Mr. Raheem and Kufanya met with Father LoConte one or two hours after Father LoConte had initially arrived at the facility. Kufanya, who has speed-writing skills, si-

lently took notes of the meeting. Mr. Raheem told Father LoConte that the problem was one of communication and organizational structure with respect to whom would supervise Sunni activities. He noted in particular that the Imam had no input in administrative decisions affecting the Sunni community. According to Father LoConte, Mr. Raheem also stated that the confusion might cause members of the Sunni community to believe that they were receiving unfair treatment, and might consequently result in "'negative behavior.'" On this point, Father LoConte testified that he had understood that the Sunni Muslims had refused to deal with Father Enright, and expressed his belief that this refusal contributed to the confusion regarding communication and organization.

Following his meeting with Mr. Raheem, Father LoConte met with Superintendent Henderson. He related to the Superintendent his impression that the Sunni community was placing pressure upon Mr. Raheem.

Later that afternoon, which was a Friday, Mr. Raheem led the Sunni Jummuah services. Two corrections officers, Francis J. Guerin and an officer named Smith, had been assigned to provide coverage during the services. While Officer Smith remained in an anteroom immediately off the Chapel, Officer Guerin stood at the entrance into the Chapel for a few minutes, and then moved to a back pew in a row of pews farthest from the area in the rear of the Chapel where the Sunni Muslims were having their services. According to the testimony of Mr. Raheem, Kufanya, and of Abdallah Saud Abdul-Latif, a member of the Auburn Sunni community and the Wazir, or Minister, of security and order, prior to the month of October, there had not been any corrections officer in the Chapel during services, and that, previously, an officer had remained in the anteroom.

Shortly after Officer Guerin entered the Chapel, a Sunni "usher," Mr. Robinson, approached the officer, stood next to him, and looked at him. Unsure as to whether the actions of Mr. Robinson were a customary part of the service, Officer Guerin left the Chapel and asked Officer Smith to relieve him, in order to find out whether Mr. Robinson would act similarly toward Officer Smith. Officer Smith was in fact approached by Mr. Robinson. Officer Smith then asked Mr. Robinson to step into the anteroom, where he asked Mr. Robinson why he had been watching the officers so closely. Mr. Robinson then asked why the officers were in the Chapel, and indicated that it was his "'duty'" to watch the officers.

Meanwhile, the behavior displayed inside the Chapel toward the officers had come to the attention of Sgts. Burns and Brimmer. The sergeants arrived at the anteroom just after Officer Smith had finished speaking with Mr. Robinson. They inquired of Mr. Robinson as to why he had been behaving in that manner towards corrections officers. Mr. Robinson stated to the sergeants that he had been ordered by the Imam to guard the officers.

After the services, Sgt. Burns met with Messrs. Raheem and Latif. Mr. Raheem told the sergeant that the movement of Officer Guerin, and the figures on the officer's uniform, had disturbed the conduct of the services. Additionally, Mr. Raheem expressed an objection to the presence of officers during the services. In response, Sgt. Burns said that there would be an officer posted inside the Chapel during services; that such a procedure was not a new policy; that there would be no inmates covering a corrections officer in the Chapel; and that such coverage interfered with the officer's performance of his duties. In regard to the placement of the officer in the Chapel, Sgt. Burns explained to Mr. Raheem that the officer would be seated at a chair just inside the Chapel door, but that the officer would be able to move around when necessary for security purposes, and that when moving, the officer would not step onto the prayer rugs unless it were an emergency. Mr. Raheem apparently acceded to these terms, and requested through Sgt. Burns a meeting with Deputy Superintendent Nelepovitz.

Sgt. Burns then communicated the security guidelines to Officers Guerin and Smith, and asked Officer Guerin to submit a report of what had transpired in the Chapel. He next reported to Deputy Superintendent Nelepovitz about the events in the Chapel and about the security arrangements for the placement of officers in the Chapel during jummuah services. Sgt. Burns also told the Deputy Superintendent of Mr. Raheem's request for a meeting. Deputy Superintendent Nelepovitz apparently adopted the security coverage arrangements, and related the guidelines to Sgt. Brimmer. At the hearing, the Deputy Superintendent testified that Sgt. Burns's report on the events which occurred in the Chapel that day was unlike any other report that he had ever received.

Following the Friday afternoon incident, Mr. Raheem addressed a letter on October 25, 1981, to Rev. Dr. Moore, expressing the possibility that he and other leaders of the Sunni Muslim community would be transferred "in an attempt on the part of the administration to indicate that the existing problem [at Auburn] stems from personality problems." Mr. Raheem went on to explain that the Sunni services had been disturbed by the assignment of officers inside the Chapel. Such "intimidation," Mr. Raheem elaborated, made it difficult for him and other persons in the community "to check the serious objection by the members at large to this and other acts of provocation." Describing the "day-to-day situation" as "precarious", apparently because Mr. Raheem believed that certain officials were seeking to cause a "confrontation", Mr. Raheem concluded his letter by urging Rev. Dr. Moore to intervene, and determine the proper relationship between the prison administration and the Sunni religious group.

The next day, Monday, October 26, 1981, Father LoConte filed a report with Rev. Dr. Moore concerning his October 23 meeting with Mr. Raheem. In both the report, and in a conversation with Rev. Dr. Moore, Father LoConte voiced his shared opinion with Mr. Raheem that a well-defined administrative process was needed. Based upon this opinion, Father LoConte recommended that Directive 4202 be applied to the Auburn situation. This directive, which had been reissued October 1, 1981, required that communications would go only through the Senior Chaplain, and then directly to the Superintendent. Rev. Dr. Moore agreed with the recommendation of Father LoConte.

On Thursday, October 29, 1981, Mr. Raheem was told by Sgt. Brimmer that Deputy Superintendent Nelepovitz had declined his October 23 request for a meeting. According to Mr. Raheem, Sgt. Brimmer also stated that security officers assigned to the Chapel would move anywhere they wished.

On the morning of Friday, October 30, 1981, Sgt. Brimmer instructed corrections officers working that day on the security coverage of Sunni jummuah services. He stated that an officer would be inside the Chapel and would move around if necessary, but would not unnecessarily intrude upon the prayer rugs or disrupt the performance of the services. Among the persons who received these instructions were Officers Guerin and John H. Bennenk, Jr.

Shortly before services, Mr. Raheem saw Deputy Superintendent Nelepovitz briefly in a housing block. Mr. Raheem spoke to the Deputy Superintendent about the presence of officers during the services, and about problems with Father Enright. Deputy Superintendent Nelepovitz told Mr. Raheem that he had orders from Albany to assign officers inside the Chapel during jummuah services, and that this security coverage should have been the practice all along. Additionally, the Deputy Superintendent stated that he had no reservations about the security arrangements made by Sgt. Burns.

At 1:30 p. m. that day, Mr. Raheem began the jummuah services. Officer Guerin provided security coverage in the Chapel, and Officer Smith stationed himself in the anteroom. Officer Guerin again sat on a back pew, where, according to his testimony at the hearing, he had a good vantage point. A few minutes into the service, Father Enright entered the Chapel, and seated himself on a pew in front of Officer Guerin.

Father Enright had heard that the Sunni Muslims were unhappy about the placement of a security officer inside the Chapel during jummuah services. Since the preceding Friday, Father Enright had attempted on three occasions to contact Mr. Raheem for the purpose of speaking with him. Mr. Raheem had refused these contacts. In the meantime, Father Enright had contacted the American Muslim Mission about the security situation. This group of Muslims, who met in an auditorium of the facility, had said that there were no problems regarding security officers at their services. Earlier on October 30, Father Enright had visited the American Muslim Services, seating himself next to an officer situated inside the auditorium. Father Enright had observed the services for a few minutes, and then had left to visit the Sunni Muslim services being held in the Chapel.

Inside the Chapel, according to Mr. Raheem, Father Enright's status as a Catholic priest, and his very presence, caused a disruption of the jummuah services. Mr. Raheem stopped the services, and asked Father Enright to leave, telling him that he was disturbing the services. Father Enright responded that he was there to observe and to ascertain whether the security officers were disrupting the services. Then, Mr. Latif, joined by two "ushers," Mr. Flowers and another individual, came close to Father Enright and asked him to leave. When Father Enright did not leave, Mr. Latif turned to Mr. Raheem, who, according to Father Enright and Officer Guerin, stated that he wanted Father Enright removed, or who, according to Messrs. Raheem and Latif, stated that he wanted Father Enright to leave. Mr. Latif once more requested Father Enright to leave. When Father Enright again did not leave, Mr. Latif, according to Messrs. Raheem and Latif, asked Mr. Raheem if he wanted Father Enright to leave, or, according to Father Enright and Officer Guerin, asked Mr. Raheem if he wanted Father Enright physically removed. Mr. Raheem nodded. Understanding this nod to mean that he should get Father Enright to leave, Mr. Latif stepped toward Father Enright. At that point, Officer Guerin stood up, and he and Father Enright left the Chapel. The services were then resumed.

In the anteroom, Father Enright told Officer Guerin that he could return to his post in the Chapel. Officer Guerin then returned to his position on a back pew. Father Enright left the Chapel area and informed the corrections officer in charge of the Chaplain's corridor, Officer Stanley Sierzega, that he was going to Deputy Superintendent Nelepovitz to report the incident. In the Deputy Superintendent's office, Father Enright reported that he had been forced to leave the Sunni Muslim services under pressure. In this regard, Father Enright testified that inmates have no authority to compel staff persons to leave a service area, and that channels are available to inmates for the redress of whatever grievances they might have along this line.

While Father Enright was in the office of the Deputy Superintendent, Officer Sierzega telephoned Officer Bennenk, who had been stationed in an area near the chapel, and asked him to relieve either Officer Guerin or Officer Smith. Officer Sierzega wanted to speak to one of the officers who had been assigned to the Chapel. Officer Bennenk, aware of the incident concerning Father Enright, proceeded to the anteroom area, saw Officer Smith there, and relieved him. Officer Guerin then came to the anteroom, and exchanged posts with Officer Bennenk. While Officer Guerin observed the Chapel from an anteroom window, Officer Bennenk entered the Chapel.

Inside the Chapel, Officer Bennenk decided to investigate, as a security measure, certain alcove areas in front of the chapel. The officer had covered Sunni jummuah services in the former masjid, where he had been accustomed to securing the area before the commencement of services, and then placing himself at a door just outside the services from which point he could maintain visual and auditory surveillance of the entire area.

As Officer Bennenk moved toward the front area of the chapel, he was followed by

Mr. Latif. When the officer reached the front, turned, and proceeded toward the Sunni prayer area, Messrs. Latif and Flowers approached the officer. These "ushers", and Mr. Raheem, asked the officer to stand by the door. Officer Bennenk responded that he did not have to remain by the door; that he could cover the entire area so long as he was not disruptive of the service and did not step on the prayer rugs; and that he had not been disruptive because he had walked quietly around the Chapel, and had not spoken to any member of the community until he had been first addressed. When Officer Bennenk did not leave, Messrs. Latif and Flowers each took the officer by one arm, and proceeded with him toward the anteroom door. Officer Bennenk pulled himself away, and went to the anteroom. Officer Bennenk told Officer Guerin that a problem had arisen, and left to report the matter to Sgt. Cimildora. Officer Guerin then entered the Chapel to maintain a security post.

Deputy Superintendent Nelepovitz learned of the incident concerning Officer Bennenk while Father Enright was still in his office. The Deputy Superintendent requested Lt. Poole to go to the Chapel area, where he was to meet Capt. Norris and investigate the situation. Deputy Superintendent Nelepovitz also requested that the officers involved in the matter be directed to submit detailed reports of what had occurred, and to report directly to his office.

Soon in the anteroom area were congregated Lt. Poole, Captain Norris, Sgt. Cimildora, Sgt. Edding, Officer Bennenk, and perhaps four other corrections officers. Mr. Raheem, aware of noises in the anteroom, sent Kufanya and Mr. Latif to speak to whomever was in charge, and to tell that person that Mr. Raheem wanted to have an urgent meeting with Deputy Superintendent Nelepovitz. Kufanya understood from an officer that Mr. Raheem, himself, and Mr. Latif would be able to talk to Deputy Superintendent Nelepovitz following the jummuah services.

At approximately 4:00 p. m., after the jummuah services, Mr. Raheem, Kufanya, and Mr. Latif were taken to a visiting room area where they thought they were waiting to see the Deputy Superintendent. At or around this time, Deputy Superintendent Nelepovitz had received reports from Officers Guerin and Bennenk, and from Father Enright about what had transpired in the Chapel. Thereafter, at 4:50 p. m., the Deputy Superintendent had Messrs. Raheem, Latif, and Flowers, sent to disciplinary SHU pending further investigation. The Deputy Superintendent had Kufanya taken to SHU for protective admission custody, because Kufanya was an assistant to Mr. Raheem and the administration was unsure what might take place as a result of the "confrontation." In addition, Deputy Superintendent Nelepovitz wanted to investigate the role, if any, Kufanya played in the events of October 30.

Superintendent Henderson had been out of town that day, but Deputy Superintendent Nelepovitz advised him by telephone about the incidents in the Chapel. Even though the investigation thus far indicated that Kufanya had played no active role in regard to the removal of Father Enright and Officer Bennenk, the Superintendent and Deputy Superintendent were of the opinion that Kufanya should be transferred. The Superintendent had received confidential information to the effect that Kufanya was one of the most influential members of the Sunni Muslim community. Because of this position of influence, Superintendent Henderson believed that Kufanya would be a proper person to transfer in order to break up whatever "clique" had "resulted in" the confrontation. Following his conversation with Superintendent Henderson, Deputy Superintendent Nelepovitz telephoned Deputy Commissioner Grad's office in Albany, and it was agreed that Kufanya would be transferred.

That night, Officers Guerin and Bennenk wrote up reports against the inmates who had been involved in the Chapel incidents. Eventually, Mr. Raheem was charged with five matters, including interfering with an officer's duty.

The next day, October 31, 1981, Kufanya was transferred to the Attica Correctional Facility. Later that day, Rev. Dr. Moore, at the request of Deputy Commissioner Gard, arrived at the Auburn facility and met with the person in charge that day, which was Deputy Superintendent Nelepovitz. After meeting with the Deputy Superintendent, who told him about the events of October 30, Rev. Dr. Moore met with Messrs. Raheem, Latif, and Flowers, to ascertain whether the men were alright. Mr. Raheem gave Rev. Dr. Moore his account of the events of the previous day, and again discussed the perceived problems concerning Father Enright. Rev. Dr. Moore then told Mr. Raheem that there was no defense to the inmates' placement of hands on a corrections officer, and that he held Mr. Raheem, as Imam, responsible for the leadership of the community. Also, Rev. Dr. Moore may have informed Mr. Raheem that Rev. Nussey, and not Father Enright, would serve as the channel of communication for the Sunni Muslim community. Following this meeting with Messrs. Raheem, Latif, and Flowers, Rev. Dr. Moore conferred with Rev. Nussey and Father Enright. Father Enright explained his version of what had occurred during the jummuah services.

In the meantime, a misbehavior report, which is the initial step toward a disciplinary Superintendent's Proceeding, had been formally filed against Mr. Raheem on Friday, October 30, 1981. Because no clerical staff worked on weekends, it was not until Monday, November 2, 1981, that the report was processed, the second step towards a Superintendent's Proceeding. Also on Monday, the Adjustment Committee met with Mr. Raheem, the third step towards a Superintendent's Proceeding. The Committee formally referred the matter to a Superintendent's Proceeding. Because Tuesday, November 3, 1981, was an election holiday, Mr. Raheem was not served with the charges until Wednesday, November 4, 1981. The charges, which were served by Corrections Counselor Tom Oberg, advised Mr. Raheem that he would be "permitted to call witnesses on his behalf provided that so

doing does not jeopardize institutional safety or correctional goals." When asked by Mr. Oberg if he wished his assistance, Mr. Raheem indicated that he did, and supplied Mr. Oberg with the names of six persons whom he wished Mr. Oberg to interview as witnesses.

That same day, Mr. Oberg interviewed one of the witnesses, Sgt. Burns, and wrote out the sergeant's statement as to what the policy was concerning the security coverage of jummuah services. At the hearing, Sergeant Burns testified that he was unaware that Mr. Oberg was assisting Mr. Raheem, or taking his statement. The sergeant also stated that Mr. Oberg did not electronically record the conversation. On this point, Sergeant Burns suggested that there had been no recording because he was a witness on behalf of an inmate. Had he been a witness on behalf of the administration, Sgt. Burns indicated, a deputy superintendent would have interviewed him with a recorder.

Following a mandatory 24-hour waiting period after the service of charges upon Mr. Raheem, *see* 7 N.Y.C.R.R. § 253.3(b), on Thursday, November 5, 1981, Assistant Deputy Superintendent for Security Eugene F. Reynolds commenced the Superintendent's Proceeding against Mr. Raheem. By this time, Mr. Oberg had completed his interviewing of five Sunni inmate witnesses in regard to the October 30 events, and had furnished all witness statements to the Assistant Deputy Superintendent. The entire hearing that day was taped, and Mr. Raheem was present. Assistant Deputy Superintendent Reynolds read the charges to Mr. Raheem, advised him of his *Miranda* rights, and asked him if he admitted or denied the charges. Mr. Raheem denied the charges, and was permitted to explain his position. The Assistant Deputy Superintendent then read into the record the witness statements supplied on behalf of Mr. Raheem, who sat silently during his reading. Because Mr. Raheem denied the charges, Assistant Deputy Superintendent Reynolds adjourned the Superintendent's Proceeding for the purpose of taking the

testimony of the facility's witnesses, namely, the officers involved in the incidents of October 30.

At some point after the commencement of the Superintendent's Proceeding, Assistant Deputy Superintendent Reynolds learned that Prisoners' Legal Services was challenging the proceeding on the ground that the testimony of witnesses on behalf of Mr. Raheem should have been taped. The Assistant Deputy Superintendent had his chief clerk contact the Albany office for directions on this point. The response was that the Auburn facility would soon be interviewing on tape witnesses requested by inmates, but that this procedure would not be retroactive, and thus would not apply to Mr. Raheem's proceeding. In this regard, the Assistant Deputy Superintendent testified that in the past, statements of witnesses on behalf of inmates had been recorded at the Auburn facility, but that this practice had been abandoned because the facility learned that other institutions were not following it and were instead letting corrections counselors conduct interviews and take statements; and because electronic recording presented quite a workload.

Also on November 5, 1981, Father LoConte met with Superintendent Henderson, Rev. Nussey, Father Enright, and other persons to define the liaison position vis-a-vis the Sunni Muslims, according to Directive 4202. Father Enright questioned the change, and drafted a response to Rev. Dr. Moore on the issue, but nonetheless appeared to accept the determination.

Around this same time, Superintendent Henderson made a decision to transfer Mr. Raheem on account of the events of October 30. The reason for the transfer, according to Superintendent Henderson, was to remove Mr. Raheem from his base of influence. The Superintendent testified that Mr. Raheem truly misbehaved by controlling the actions of inmates and ordering them to physically remove members of his staff. Additionally, Superintendent Henderson stated that any inmate leader who placed himself in this situation would thereafter have a reputation to uphold in the

facility among the inmates. Also, he asserted that for the last four years, there had been a 75% to 100% turnover in the population at the Auburn facility as a result of transfers. On this point, the Superintendent explained that if a superintendent has a reason that can be justified to the Commissioner, he or she can transfer any inmate whom he or she perceives as a problem or potential problem.

On the issue of Mr. Raheem's transfer, Superintendent Henderson testified that a transfer would be warranted because, through Mr. Raheem's direction, or failure to disapprove, an officer had been physically removed from an area assigned to him. In this regard, the Deputy Superintendent stated that in his 32 years of correctional service, he could remember only two incidents where inmates took it upon themselves to physically remove an officer from his assigned area: during the Auburn riots of 1970, and during the Attica riots of 1971. Deputy Superintendent Nelepovitz also opined that there would have been a very serious confrontation had Officer Bennenk not acted in a professional manner. Finally, the Deputy Superintendent said that it is standard practice to transfer an inmate when he assaults an employee, or causes an employee to be assaulted. The poor communications between the Sunni Muslims and Rev. Nussey and Father Enright, Deputy Superintendent Nelepovitz continued, would also be contributing factors in a decision to transfer Mr. Raheem.

Because of the time needed to question witnesses, and to devote to other proceedings, it was not until Tuesday, November 10, 1981, that Assistant Deputy Superintendent Reynolds reconvened the Superintendent's Proceeding. Again, Mr. Raheem was present. The Assistant Deputy Superintendent told Mr. Raheem that, based upon testimony he had taken, he was affirming the charges. The disposition ordered was 90 days confinement in SHU, and 90 days loss of good time. A final disposition was served upon Mr. Raheem on Thursday, November 12, 1981.

## II.

Mr. Raheem maintains that his proposed transfer is in retaliation for his advocacy and exercise of religious liberties, and impinges his right of access to the courts. The Superintendent, on the other hand, contends that Mr. Raheem's transfer is motivated by compelling security interests at the Auburn facility.

It is beyond dispute that incarcerated persons, like free persons, enjoy a right to freedom of religion under the First Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979); *Wolff v. McDonnell*, 418 U.S. 539, 556, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974); *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974); *Cruz v. Beto*, 405 U.S. 319, 322, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972) (per curiam); *Burgin v. Henderson*, 536 F.2d 501, 502–03 (2d Cir. 1976). *See also* N.Y.Correc.Law § 610; *Brown v. McGinnis*, 10 N.Y.2d 531, 180 N.E.2d 791, 225 N.Y.S.2d 497 (1962). Also, prison inmates have a right of access to the courts, whether this right is founded in the First Amendment right to petition, or in the Due Process Clause. *See Bounds v. Smith*, 430 U.S. 817, 821–22, 97 S.Ct. 1491, 1494–95, 52 L.Ed.2d 72 (1977); *Wolff v. McDonnell*, 418 U.S. at 556, 576–79, 94 S.Ct. at 2974, 2984–86; *Cruz v. Beto*, 405 U.S. at 321, 92 S.Ct. at 1081; *Johnson v. Avery*, 393 U.S. 483, 485, 89 S.Ct. 747, 748, 21 L.Ed.2d 718 (1969); *Bonner v. City of Prichard*, 661 F.2d 1206, 1212 (11th Cir. 1981) (*en banc*); *Milhouse v. Carlson*, 652 F.2d 371, 373 (3d Cir. 1981). *See also California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 513, 92 S.Ct. 609, 613, 30 L.Ed.2d 642 (1972). Attending both rights are correlative duties on the part of institutional authorities not to burden, limit, or impinge these rights except when reasonably necessary to maintain security or preserve order or discipline, or when otherwise warranted in light of legitimate goals or policies of the facility. *See Bell v. Wolfish*, 441 U.S. at 545–47, 99 S.Ct. at 1877–78; *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 125, 129–30, 97 S.Ct. 2532, 2539–40, 53 L.Ed.2d 629 (1977); *Wolff*

*v. McDonnell*, 418 U.S. at 556, 94 S.Ct. at 2974; *Burgin v. Henderson*, 536 F.2d at 502–03; *Kahane v. Carlson*, 527 F.2d 492, 495 (2d Cir. 1975); *LaReau v. MacDougall*, 473 F.2d 974, 979 (2d Cir. 1972), *cert. denied*, 414 U.S. 878, 94 S.Ct. 49, 38 L.Ed.2d 123 (1973); *Laaman v. Perrin*, 435 F.Supp. 319, 326 (D.N.H.1977).

■■ These duties delimit the authority of correctional officials to transfer an inmate. It is true, generally, that the Commissioner has broad discretion to order the transfer of an inmate, *see, e.g., Montanye v. Haymes*, 427 U.S. 236, 243, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976); N.Y.Correc.Law § 23; *Johnson v. Ward*, 64 A.D.2d 186, 188, 409 N.Y.S.2d 670, 672 (3d Dep't 1978), and that an inmate has no Due Process liberty interest in not being transferred, *see Montanye v. Haymes*, 427 U.S. at 242, 96 S.Ct. at 2547; *Meachum v. Fano*, 427 U.S. 215, 216, 224–25, 96 S.Ct. 2532, 2534, 2538, 49 L.Ed.2d 451 (1976). Where, however, a transfer is solely in reprisal for an inmate's exercise of constitutionally protected liberties, the transfer is unlawful. *See Montanye v. Haymes*, 427 U.S. at 244 & n.*, 96 S.Ct. at 2548 & n.* (Stevens, J., dissenting); *Cruz v. Beto*, 405 U.S. at 322, 92 S.Ct. at 1081; *Milhouse v. Carlson*, 652 F.2d at 373–74; *Haymes v. Montanye*, 547 F.2d 188, 190 (2d Cir. 1976) (on remand), *cert. denied*, 431 U.S. 967, 97 S.Ct. 2925, 53 L.Ed.2d 1063 (1977); *Fajeriak v. McGinnis*, 493 F.2d 468, 470 (9th Cir. 1974); *Sostre v. McGinnis*, 442 F.2d 178, 189, 202 (2d Cir. 1971) (*en banc*), *cert. denied sub nom.* 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972), 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972). *Cf.:* N.Y.Correc.Law § 138(4). On a claim of retaliatory transfer, an inmate shoulders the burden of proving that he or she would not have been transferred but for the exercise of a constitutionally protected liberty. *See McDonald v. Hall*, 610 F.2d 16, 18 (1st Cir. 1979).

■ Based upon the evidence presented at the hearing, this Court concludes that Mr. Raheem has failed to carry this burden.

Both Superintendent Henderson and Deputy Superintendent Nelepovitz presented expert testimony concerning the security threat that Mr. Raheem would pose if he were returned to the general inmate population at Auburn. This threat would arise by virtue of the expectations that inmates now would have of Mr. Raheem, and by virtue of Mr. Raheem's authority over members of the Sunni community. On this latter point, Rev. Dr. Moore wisely placed upon Mr. Raheem the responsibility, as Imam, for the actions of his followers, during religious services, who are sworn to obey him and carry out his wishes. At the October 30 jummuah services, Mr. Raheem effectively ordered, by action or inaction, the removal of staff persons, or was unable to control the behavior of persons over whom he professes to exercise authority in regard to the conduct of religious services. In either case, the uncontroverted testimony is that the removal of staff persons is a serious infraction of prison rules and regulations pertaining to the safety of persons in the facility. No matter how frustrated Mr. Raheem might have been at the perceived insensitivity of the administration to the needs of the Sunni Muslims, and no matter what the religious liberties enjoyed by free Sunni Muslims might be, Mr. Raheem, as an Imam in a prison setting, had no license to sit back and watch his "ushers" remove, or attempt to remove, staff persons whom the ushers believed to be violating the Imam's directions regarding the conduct of jummuah services.

As the testimony at the hearing established, an inmate Imam must strike a delicate balance between the demands of his role as Imam and the restrictions placed upon him because he is imprisoned. This balance plainly was not struck here. Confronted with the conduct of Mr. Raheem, and with the results of Mr. Raheem's conduct, the Superintendent was amply warranted in deciding that Raheem was a security risk in a maximum security facility, and that he should accordingly be transferred.

For these reasons, it cannot be said that Mr. Raheem was transferred in retaliation for the exercise of any constitutionally protected liberties.

III.

Mr. Raheem also contends that the Superintendent's Proceeding was unlawful, because it was not completed within seven days following his initial confinement in SHU; because witnesses on his behalf did not testify at the hearing; because statements of his witnesses were not electronically recorded; and because he was not afforded an opportunity to confront the evidence against him.

In regard to the timeliness of the proceeding, a brief discussion of judicial treatment of this issue is in order. In *Powell v. Ward*, 392 F.Supp. 628 (S.D.N.Y.1975), the district court imposed a number of procedural due process requirements upon the conduct of Superintendent's Proceedings at one New York correctional facility. The court noted that "no prisoner should be confined to special housing while her case is 'pending investigation' by the Adjustment Committee", *id.* at 632, and issued an order, settled by the parties, which required that disciplinary hearings be "held" within seven days of confinement in SHU, *see Powell v. Ward*, 542 F.2d 101, 103 (2d Cir. 1976). In this regard, prior to the district court's disposition of *Powell v. Ward*, the State Commissioner of Correctional Services had promulgated a directive recommending that a proceeding be held within seven days of confinement in the absence of exigent circumstances. *See id.* at 103. On appeal, the Commissioner urged that the injunction be modified to permit extensions in unusual or emergency situations, with the consent of the Commissioner. *Id.* The Second Circuit found this modification to be in line with the requirements of Due Process. *Id.* at 104. Thereafter, contempt proceedings were brought against the State Commissioner. *See Powell v. Ward*, 487 F.Supp. 917 (S.D.N.Y.1980). One of the matters before the district court concerned the "seven day" rule. Although the Commissioner contended that this rule required that hear-

ings be *commenced* with seven days, the court ruled that "held" meant that hearings must be *completed* within seven days. *Id.* at 931. The court noted also, however, that a hearing need only be held as soon as practicable if an inmate threatened the security of the facility. *Id.* at 932 n.13. On appeal, the Second Circuit rejected the Commissioner's argument that "held" was ambiguous, and upheld the district court's determination that the Commissioner had acted in violation of a court order. *Powell v. Ward*, 643 F.2d 924, 932 (2d Cir. 1981) (per curiam), *cert. denied*, —— U.S. ——, 102 S.Ct. 131, 70 L.Ed.2d 111 (1981). The Second Circuit does not appear, at any time, to have expressly ruled upon the constitutional merits of the seven-day rule. In the context of Adjustment Committee hearings and keeplock status, however, the Second Circuit has concluded that if "an inmate's continued presence in the general prison population poses a threat . . . to the safety of others", the inmate may be confined "as long as a hearing follows as soon as it is practicable." *McKinnon v. Patterson*, 568 F.2d 930, 939 n.10 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978).

If this Court were to apply the rulings in the *Powell v. Ward* litigation, Mr. Raheem would squarely fall into the exception to the seven-day rule for persons believed to present security risks if returned to the general prison population. The Court, however, is inclined to reach the merits of the seven-day rule, and, doing so, respectfully does not share the position of the Southern District.

The Supreme Court has emphasized that, with respect to prisoners' rights, "there must be *mutual accommodation* between institutional needs and objectives and the provisions of the Constitution . . ." *Wolff v. McDonnell*, 418 U.S. at 556, 94 S.Ct. at 2974 (emphasis supplied). The Court has also noted that incarcerated persons are entitled to "*minimum* procedures appropriate under the circumstances and required by the Due Process Clause to insure that [their "liberty" interest] is not arbitrarily abrogated." *Id.* at 557, 94 S.Ct. at 2975 (emphasis supplied).

This Court believes that the *Powell v. Ward* seven-day rule neither "accommodat[es]" the needs of the Auburn Correctional Facility, nor is necessarily a component of Due Process. For example, it would be unreasonable to require employees of the Auburn facility to work on holidays in order to complete a hearing within seven days, and to require resort to the Commissioner for extensions of time under such ordinary circumstances. More importantly, this Court is reminded daily that justice cannot, and ought not, be equated with speed. Any rule that places restrictions upon the times during which a fact-finder may search for the truth is thus suspect.

At the same time, the Court agrees that proper accommodation to a prisoner's "liberty" interest and due process rights does dictate that some temporal strictures be placed upon the conduct of disciplinary proceedings. On this point, the defendants have argued here that the Commissioner's guideline concerning the holding of Superintendent's Proceedings mandates only that such hearings be commenced within seven days following placement in SHU, except in extraordinary circumstances where the Commissioner authorizes otherwise. In a recent decision, one New York court has adopted the Commissioner's construction. *See Witherspoon v. LeFevre*, 82 A.D.2d 959, 960, 440 N.Y.S.2d 375, 376 (3rd Dep't 1981). The Court is of the opinion, however, that this interpretation of the guideline should serve as an "outside" time limit for the commencement of Superintendent's Proceedings. Principles of due process would seem to require that Superintendent's Proceedings be commenced as soon as is reasonably practicable *following* the inmate's initial confinement in SHU, and, in no event, be commenced beyond seven days of confinement without authorization of the Commissioner. Additionally, it is appropriate to require that a disciplinary hearing be completed within a reasonable time following its commencement. In this regard, the record of the hearing should reflect the reasons for any delay or adjournment of the

proceedings, and an inmate should ordinarily be made aware of these reasons.

■ Applying these principles here, this Court is satisfied that the timing of Mr. Raheem's disciplinary hearing comported with the requirements of due process. Mr. Raheem appeared before the Adjustment Committee on the first working day following his confinement, and was served with a copy of the charges on the second working day. Following a mandatory 24 hour waiting period, in order for Mr. Raheem to review the charges and make arrangements for assistance, and within six days following Mr. Raheem's SHU confinement, the Assistant Deputy Superintendent formally commenced the Superintendent's Proceedings. After a two working-day adjournment for the purpose of taking additional testimony, an adjournment explained to Mr. Raheem, the Superintendent's Proceedings were recommenced, and Mr. Raheem was advised of the disposition, which was served upon him two days later. The Court finds nothing unreasonable about these delays and procedures.

■ With respect to Mr. Raheem's contention that his witnesses should have testified at the hearing, it is true that an inmate must be allowed to call witnesses on his behalf at a disciplinary hearing, unless such a procedure would be unduly hazardous to the safety of persons, or would unduly compromise correctional goals of the facility. *See, e.g., Baxter v. Palmigiano,* 425 U.S. 308, 320, 96 S.Ct. 1551, 1559, 47 L.Ed.2d 810 (1976); *Wolff v. McDonnell,* 418 U.S. at 566, 94 S.Ct. at 2979; *Bartholomew v. Watson,* 665 F.2d 915, 917–18 (9th Cir. 1981); *Jensen v. Satran,* 651 F.2d 605, 607 (8th Cir. 1981); *Crooks v. Warne,* 516 F.2d 837, 839 (2d Cir. 1975). *Cf :* 7 N.Y.C.R.R. § 253.4(b)(1). On this point, although the Supreme Court has suggested that the Due Process Clause does not require a facility to state, in writing, its reasons for the denial of witnesses, at least so long as the record supplies some support for the denial, *see Wolff v. McDonnell,* 418 U.S. at 566, 94 S.Ct. at 2979; *Hayes v. Thompson,* 637 F.2d 483, 488 n.4 (7th Cir. 1980), the Southern District of New York

has ordered in the *Powell v. Ward* litigation that such a statement be afforded inmates, *Powell v. Ward,* 487 F.Supp. at 929. *Cf: Jacobson v. Coughlin,* 523 F.Supp. 1247, 1252–53 (N.D.N.Y.1981).

■ Here, although Mr. Raheem had the right to call witnesses at his hearing, there is no evidence in the record that he ever invoked this right. During the disciplinary hearing, Mr. Raheem apparently made no request for his witnesses to be called to testify. Because Mr. Raheem made no objections at or before the hearing, he may not now raise his argument before this Court. *Cf: Collazo v. Wilmot,* 75 A.D.2d 655, 656, 426 N.Y.S.2d 352, 353 (3d Dep't 1980); *People ex rel. Alonzo Starling v. Smith,* (Sup.Ct., Wyoming Co. October 6, 1981) (Conable, T.A.S.Ct.Justice).

■ Turning to the question of whether the statements of Mr. Raheem's witnesses should have been electronically recorded by Mr. Oberg, there is no evidence in the record that Mr. Raheem requested such recording, or that Mr. Raheem objected to or challenged the statements at the disciplinary hearing. In view of these facts, this Court is of the opinion that Mr. Raheem may not press his claim at this time.

Finally, in regard to Mr. Raheem's argument that he should have received an adequate opportunity to confront and respond to the evidence against him, and to explain his actions in light of this evidence, the Supreme Court has indicated that such matters are left in the sound discretion of facility officials. *See, e.g., Baxter v. Palmigiano,* 425 U.S. at 320, 322, 96 S.Ct. at 1559; *Wolff v. McDonnell,* 418 U.S. at 567–69, 94 S.Ct. at 2980–81. From the facts presented to the Court, there is no evidence that officials abused their discretion.

### III.

For the foregoing reasons, the application for an injunction against the transfer of Mr. Raheem is denied. The requests for expungement of the record of the Superintendent's Proceeding and for restoration of Mr. Raheem's good time are also denied.